Paul RUIZ and Earl VAN DENTON *v.* STATE
of Arkansas

CR 80-147                                        617 S.W. 2d 6

Supreme Court of Arkansas
Opinion delivered June 8, 1981
[Rehearing denied July 6, 1981.]

*Lessenberry & Carpenter*, by: *Thomas M. Carpenter*, for appellants.

*Steve Clark*, Atty. Gen., by: *Victra L. Fewell*, Asst. Atty. Gen., for appellee.

STEELE HAYS, Justice. Appellants were first convicted in Logan Circuit Court of crimes of capital murder in the June 29, 1977, robbery, kidnapping and shooting deaths of Marvin Ritchie and Opal James. The jury returned death sentences. On appeal, we reversed the trial court's denial of motions for a change of venue, pointing to the oppressive and unprecedented pre-trial publicity surrounding the crimes. *Ruiz & Van Denton* v. *State*, 265 Ark. 875, 582 S.W. 2d 915 (1979). On remand, the case was transferred to the Conway Circuit Court, the most distant in that judicial district. In the second trial, verdicts of guilt were again returned and in the penalty phase the jury found a number of aggravating factors, no mitigating factors and again imposed sentences of death by electrocution. This appeal is from the second conviction.

While serving life sentences, appellants escaped from the Oklahoma State Prison on June 23, 1977. On the morning of June 29 they were seen near the town of Magazine, in Logan County, parked along Scott Creek Road in a 1972 Ford automobile with a Louisiana license. The record is silent as to where or how, but sometime early that morning, the marshal of Magazine, Marvin Ritchie, came in contact with appellants. His shirt was taken from him and he was placed in the back of his car, his hands handcuffed

behind his back. That same morning David Small and Opal James, employees of the Corps of Engineers, were working in the area of Blue Mountain Lake. Driving a Corps of Engineers' pickup truck, they met Marshal Ritchie's car on the road to Ashley Creek Park at around 9 o'clock. The marshal's car drove across the road, blocking their path, and appellants got out of the car brandishing pistols. Paul Ruiz was wearing Marshal Ritchie's shirt. Small and James were robbed of their shirts and billfolds and put in the back seat of the car with Marshal Ritchie. Appellants asked about roads leading west, which of them knew the area best, and were told Opal James. Appellants concealed the marshal's car in a drainage ditch and ordered Ritchie and Small into the trunk handcuffed together. Small's watch was taken from his wrist and one appellant said "you know what we've got to do." The other answered, "yes, I do." Two shots were fired, one into the brain of Marvin Ritchie, the other into the chest of David Small, and the trunk was closed.

At around 2:30 that afternoon a search party discovered the vehicle and opened the trunk to find Marvin Ritchie dead and David Small critically wounded, but alive and able to provide crucial testimony in trial. Two days later the truck and the body of Opal James were discovered in a wooded area north of Oden in Montgomery County, the body already badly decomposed. Death was caused by a single bullet through the head. The appellants were arrested on July 8, 1977, in Portland, Oregon. Additional testimony, including ballistics and fingerprinting, further connected appellants and the crimes. Neither appellant testified.

On appeal, six instances of error by the trial court are alleged. They have been reviewed along with other objections as required by Rule 36.24, A. R. Crim. P. We find no reason to reverse.

Appellants first argue that the offenses should have been severed. They were charged under Ark. Stat. Ann. § 41-1501 (1) (a) and 41-1501 (1) (c) (Repl. 1977) with the deaths of two persons while committing robbery and kidnapping; they contend that there is insufficient evidence that these offenses occurred during the same criminal episode. They

concede a similar point was raised in the first appeal, but they submit the issue was presented differently then, i.e., whether the evidence was sufficient to support the contention that both murders occurred during the course of a single criminal episode. Whereas, the issue raised now is whether the offenses should have been severed for purposes of trial, there being no common plan or scheme. Granted, the new wording is altered slightly, and if the issue is now presented in a different context, it leaves the substance of the argument essentially unchanged. In either case, if the evidence supports a determination that both homicides occurred as a part of the same criminal episode, or were parts of a series of connected acts, then it was not incumbent on the trial court to grant a severance, and certainly not mandatory. The trial court had that discretion and its discretion was not abused.

We disagree that these two murders are not within a single criminal episode or a series of connected acts. Rule 21.1 (b), A. R. Crim. P., permits the joinder of two offenses in one information when they are based on "a series of acts connected together ..." All three men were taken prisoner within a brief period of time, robbed, kidnapped and transported some distance to the drainage ditch where Opal James witnessed the shooting of Marvin Ritchie and David Small, the latter surviving through no credit to the appellants. The fact that Opal James's death did not occur until later does not disconnect it from the entire episode, as it is plain that his death was deferred solely because he was needed to guide the appellants in unfamiliar territory. We find no greater merit in the argument now than before. In the earlier appeal, it was said:

> We fail to understand why appellants would seriously ask us to declare that the evidence in this case was insufficient to support the verdict rendered by the jury. The fact that Marvin Ritchie was killed on the morning of June 29, 1977, and that Opal James was killed 13 or 14 hours later, in Montgomery County or Scott County, does not prove that these two men were not killed in the same criminal episode.

Appellants invoke Rules of Crim. Proc., Rule 22.2 (a) (1976):

> Whenever two (2) or more offenses have been joined for trial solely on the ground that they are of the same or similar character and they are not part of a single scheme or plan, the defendant shall have a right to a severance of the offenses.

They argue that the offenses are not part of a single scheme or plan. That assertion is debatable, but whether they were part of a single plan or simply random, disconnected crimes is beside the point, because they constitute one criminal episode and when a series of acts are connected that is enough to give the state a right to join them in a single information. Rule 21.1, *supra*.

The commentary to Rules 21, 22 and 23 states that they are designed "to promote expeditious disposition of criminal cases" without resulting in prejudice to the defendants and without unreasonably restricting the trial court's discretion in finding the right balance between the two opposing interests. (See Commentary, Article VI, Ark. Stat. Ann., Vol. 4. p. 488.) Rule 22.2, which appellants cite, gives an absolute right of severance when the offenses have been joined *solely* on the ground that they are of the same or similar character. (Commentary, p. 489.) Here, the offenses cannot be said to have been joined *solely* on that ground for the reasons we have stated, and the trial court properly declined to grant a severance.

Appellants refer to the victim in *Rowe* v. *State*, 271 Ark. 20, 607 S.W. 2d 657 (1980), though conceding a different context. *Rowe* involved the principle of double jeopardy, the issue being whether the conduct of the accused constituted a single offense as opposed to two offenses. That is not the question here, so no guidance is provided by the *Rowe* decision.

Secondly, it is urged that the court erred in excusing certain jurors for cause. The argument here is bi-fold, that three of the 21 jurors excused by the court because of

opposition to the death penalty should not have been excused for cause under the precepts announced in *Witherspoon* v. *Illinois*, 391 U.S. 510 (1968) and in *Boulden* v. *Holman*, 394 U.S. 478 (1969), and that other jurors were improperly excused because of relational ties to a secretary of the prosecuting attorney. First, appellants earnestly submit that jurors Harold Scroggins, Jo Ann Everett and James Moore did not demonstrate fixed opposition to the death penalty and, therefore, their dismissal by the court was not in keeping with *Witherspoon*, where it is held that conscientious or religious scruples against the death penalty are not disqualifying; a juror must indicate that he will automatically vote against it under any circumstances. We find these jurors gave a clear indication that they would not vote for death whatever the circumstances. It is true that all were in some respects ambivalent in their responses, depending on how the question was phrased, however, in the end all three came short of meeting the test of *Witherspoon* and *Boulden*, that in spite of conscientious scruples against capital punishment they would consider and even impose the death penalty depending on the circumstances. Appellants point out that each of the three expressed a willingness to "consider" death as a possible punishment and contend that this suffices. But all three qualified their responses by saying that they would not *vote* for the death penalty notwithstanding their willingness to consider it. To say that one would consider the death penalty but would not vote for it is nothing more than a play on words and fails the test of *Witherspoon*.

Appellants point to a "yes" answer by juror Everett when asked if she would consider both choices, life or death; but the question she was answering was expressly limited to whether she would merely "consider" the two options, as opposed to whether she could then vote on the basis of her consideration:

A: I could consider it but I could never vote for it.

Q: Well, I'm not asking you — *I'm not asking you how you would vote at that time.* I'm just saying would you consider it?

A: In other words, could I consider —

Q: — The two alternatives, you know, you have two choices. Would you give consideration to both of them and not put your mind blank on one or the other. We wouldn't want you to go out and say, "My mind is made up for the death penalty only," or "My mind is made up for the life." We would want you to consider both choices if the Judge instructed you in that way. Could you do that?

A: Yes.

Ms. Everett made it clear by repeated answers that she drew a distinction between *considering* the death penalty and *voting* for the death penalty and that she would not vote for the death penalty "under any circumstances." Nor are we willing, as appellants argue, simply to take a single answer or even the last answer given by a juror to counsel, whose questions have a partisan slant, as determinative and final; we prefer to examine the overall inquiry, especially questions posed by the trial judge in keeping with *Witherspoon* as a surer gauge of a juror's willingness to weigh all the penalties of the law against the evidence and vote accordingly. We have said several times since *Witherspoon* that the trial judge is in a better position to weigh the contradictions jurors often demonstrate when asked to say beforehand how they would vote on so profound an issue as life or death. *Hulsey* v. *State*, 268 Ark. 312, 595 S.W. 2d 934 (1980); *McCree* v. *State*, 266 Ark. 465, 585 S.W. 2d 938 (1979). The questions and answers of the other two jurors are not essentially different and we believe the trial court was justified in excusing all three under *Witherspoon*.

The second phase of this point is that juror Joe Allison was excused by the court after having been accepted by both sides because it was learned that he was a cousin to a secretary of the prosecuting attorney. Two other jurors appear to have been excused for a similar reason. Appellants argue that neither Ark. Stat. Ann. § 39-105 (Repl. 1980) nor § 43-1920 (Repl. 1977) is applicable, the first dealing with kinship to a party or an attorney and the second dealing with

a variety of relationships from which a bias might be implied. We can find no merit in the argument. The matter was brought to the trial court's attention by the prosecutor, as it should have been, on the assumption that for a cousin of one of his secretaries to serve on the jury would, at least, give the appearance of bias, especially in light of the fact that the secretary was expected to be frequently in the courtroom and actively involved in assisting the prosecutors. While the trial judge's discretion is said to be limited to the issue of actual bias (*Gammel* v. *State*, 259 Ark. 96, 531 S.W. 2d 474 [1976]), we are not willing to say he is without discretion to excuse a juror on his own where the issue of bias may be more implied than actual even though it does not fall clearly within the two statutes. It would be impossible for the statutes to cover every conceivable circumstance touching on a juror's possible bias. The court's discretion here was exercised in appellants' favor, as opposed to *Henslee* v. *State*, 251 Ark. 125, 471 S.W. 2d 352 (1971), where employees of a company whose lands defendant was charged with burning were permitted to serve as jurors by the trial judge, resulting in a reversal. We said there: "Not only should a trial be fair, it should also appear to be fair ..." Here, the trial judge simply showed an abundance of caution by excusing jurors having the appearance of an implied bias favoring the prosecutor and we could not justify treating that as an abuse of discretion. The same issue was addressed in *Strode* v. *State*, 259 Ark. 859, 537 S.W. 2d 162 (1976):

> Since a party is not entitled to have any particular juror, the erroneous rejection of a competent talesman is not prejudicial, in the absence of a showing that some biased or incompetent juror was thrust upon him.

No such showing was attempted here.

The next assertion of error deals with two black and white photographs, 8x10, which were received in evidence during the guilt phase of the trial. They show the body of Marvin Ritchie lying face down, partially handcuffed, in the trunk of the vehicle where he and David Small were shot. It is

claimed the photographs are inflammatory and, beyond that, since the same jury heard both the guilt and penalty phases of trial, the jury was tainted by the introduction of the photographs in its penalty deliberations, a novel argument. This contention is built upon language in *Gruzen* v. *State*, 267 Ark. 380, 591 S.W. 2d 342 (1979), where, discussing the same proposition, we said that the introduction of photographs could not have prejudiced the accused in the penalty phase because the jury chose the lesser punishment, or life. Here, the jury chose the death penalty. But that is dictum rather than precedent, and because that reasoning may have been correct in *Gruzen* in view of the outcome, does not mean that the reverse is true. The answer lies in the two photographs and we think the court committed no error in receiving them. They are of little evidentiary value, so far as we can observe, but they are relatively free of anything prejudicial. The wound is barely evident; no blood is visible; the face of Marshal Ritchie is not seen; even the posture of the body is relaxed and uncontorted. There is no trace of anything lurid or odious. In short, we find nothing that might be expected to arouse passion or prejudice. Further, it appears these same photographs were challenged in the first appeal and found not to be prejudicial.

Appellants claim that they should have been permitted to *voir dire* the jury between the guilt phase and the penalty phase of the trial. Citing cases holding that due process requirements of the Constitution apply equally to the penalty phase of a capital case, appellants maintain that a motion for a second *voir dire* of the jury should have been granted. It is urged that counsel needed to question the jurors to determine if they would consider both options open to them and could disregard evidence in the first phase of the trial not relevent to the issues in the penalty phase. That argument has freshness, but we find nothing cited to support this thesis and as the appellee points out, it could serve no useful purpose except to prolong the trial in view of the language of Ark. Stat. Ann. § 41-1301 (c) that the *same jury shall sit in both stages of the trial.* Upholding this argument would constitute a major disruption in the statutory scheme of capital trials under Arkansas law — a scheme we have approved in several past decisions. *Collins*

v. *State*, 261 Ark. 195, 548 S.W. 2d 106, *cert. denied* 434 U.S. 878 (1977); *Swindler* v. *State*, 267 Ark. 418, 592 S.W. 2d 91, *cert. den.*, 449 U.S. 1057, 101 S. Ct. 630 (1980). Besides, the questions counsel regards as necessary could have been asked during the initial *voir dire* proceedings. So it cannot be said that our statutory scheme deprives counsel of the opportunity to ask all the questions he deems essential.

Appellants next submit that the jury ignored mitigating evidence presented during the penalty phase, so the death penalty was the result of passion or prejudice. Evidence was presented in the second phase that both appellants suffered from character disorders which, it is said, might cause extreme pressures or emotional disturbance during the time the murders were committed. The second part of their equation is: since extreme emotional disturbance is one of the mitigating factors provided for in Ark. Stat. Ann. § 41-1304 (Repl. 1977), it follows that the jury disregarded that evidence, as shown by its failure to make a finding of any mitigating circumstances. The flaw in this premise lies in the argument itself — it is said that by finding no mitigating circumstance, the jury "completely disregarded" such evidence, while in the same breath conceding that it was not required to do so. But if the jury was not required to make such a finding, how can it be said the evidence was disregarded? It may have been disbelieved or it may have been seriously regarded and in the end rejected. For that matter, the only evidence of the presence of extreme emotional disturbance was the opinion testimony of two clinical psychologists that emotional pressures in certain situations typically accompany the disorders said to belong to these appellants. *Gruzen* v. *State, supra; Curry* v. *State*, 271 Ark. 913, 611 S.W. 2d 745 (1981). The gist of this same argument is dealt with and decided adversely in *Miller* v. *State*, 269 Ark. 341, 605 S.W. 2d 430 (1980) and *Westbrook* v. *State*, 265 Ark. 736, 580 S.W. 2d 702 (1979) and cases cited there.

This brings us to appellants' final point. They argue that our capital felony murder statute, § 41-1501 (1) (a) (Repl. 1977) and our first degree murder statute, § 41-1502 (1) (a) are overlapping and, therefore, constitutionally vague.

We recognized the overlapping in *Cromwell* v. *State*, 269 Ark. 104, 598 S.W. 2d 73 (1980) and *Martin* v. *State*, 261 Ark. 80, 547 S.W. 2d 81 (1977) concluding that some overlapping is unavoidable:

> In the first place, it is impossible to avoid the use of general language in the definition of certain offenses. *State* v. *Weston*, 255 Ark. 567, 501 S.W. 2d 622 (1973). Moreover, the prosecutor or grand jury is often compelled to choose one of two or more offenses, no matter how precise the statutes may be. For example, the conflicting testimony of eyewitnesses may, depending on their varying credibility, establish capital murder if the accused committed robbery but only murder in the first degree if he committed a lesser felony such as theft of property, battery or aggravated assault. §§ 41-2103, -2203, -1601, and -1604. There can be no constitutional objection to the exercise of a reasonable discretion in that situation. *Cromwell*, page 107.

We also concluded in *Cromwell* that the similarity of the wording of the two statutes could not have been unintentional in view of the long study given the criminal code by the drafting committee and the legislature and may have been intended to benefit the accused:

> The actual wording of the statute may have been chosen to lighten the possible punishment that might be imposed for conduct falling within the strict definition of capital murder — a consequence that might be acceptable both to the prosecution and to the defense. If that is not true in a particular case, presumably the defense can ask that the State be required to elect between two degrees. In any event, we find no constitutional infirmity in the overlapping of the two sections, because there is no impermissible uncertainty in the definition of the offenses. *Cromwell*, page 107.

This concept of our statutes was re-examined in *Wilson* v. *State*, 271 Ark. 682, 611 S.W. 2d 739 (1981), supplemental opinion delivered March 9, 1981, and reaffirmed on the same arguments raised in this appeal. Appellants cite *Beck* v.

*Alabama*, 447 U.S. 625, 100 S. Ct. 2382, 65 L. Ed. 2d 232 (1980) and *Roberts* v. *Louisiana*, 428 U.S. 325 (1976), which are of no avail, as our statutory scheme is not flawed as were those of Alabama and Louisiana. Under Alabama law the jury could not consider lesser included offenses in capital crimes and was limited to either an acquittal or a conviction, in which case death was mandatory, and, hence the jury was deprived of the "third option" of a lesser punishment, which the United States Supreme Court held to be unconstitutional. In *Roberts*, Louisiana's statutory scheme was found to be deficient. The jury in Louisiana was always instructed as to lesser included offenses (even where the evidence failed to support such a finding), the error of Louisiana's procedure being that if the jury found both elements of first degree murder, i.e., that the accused had a specific intent to kill while engaged in a felony (in this case robbery) the death penalty was mandatory. In contrast, our scheme binds the jury in no such fashion, as it is free to impose life without parole in preference to death, notwithstanding a finding of guilt on capital felony murder charges. Moreover, if the evidence is such that the jury is instructed on lesser included offenses, it may lessen the punishment accordingly as its further option.

Finally, this trial resulted in a lengthy record — nine volumes, 3,311 pages. Counsel for appellants and for appellee, following our rules, have cited and commented on many objections raised below but not argued on appeal. It would be of no value to list them singly as we find no prejudicial errors.

The sentences are affirmed.