Larry Thomas MITCHELL *v.* STATE of Arkansas
CR 87-62 742 S.W.2d 895
Supreme Court of Arkansas
Opinion delivered January 19, 1988
[Rehearing denied February 22, 1988.*]

*Hays, J. would grant rehearing.

*Sexton, Kirkpatrick, Nolan, Vanwinkle & Caddell, P.A.,* by: *Sam Sexton, Jr.,* for appellant.

*Steve Clark,* Att'y Gen., by: *J. Blake Hendrix,* Asst. Att'y Gen., for appellee.

DARRELL HICKMAN, Justice. Larry Mitchell was convicted of first degree murder and sentenced to life imprisonment.

Mitchell killed a friend of his, Ronald Sisk, when the two of them were drinking one evening in Mitchell's home in Fort Smith. The central issue in the case is the entry of Mitchell's residence by the police without a search warrant. When Corporal Danny Honeycutt of the Fort Smith Police Department opened the front door and looked into the Mitchell residence, he violated the Fourth Amendment to the United States Constitution. Consequently, all evidence seized or gained as a result of the entry has to be excluded from evidence. This does not include all the evidence, and the state may retry Mitchell.

First, we discuss the events leading up to the entry. The Fort Smith Police Department received the following telephone call at 10:44 a.m. on April 6, 1983:

A (Police): Fort Smith Police Department. Sgt. Adams.

W (Caller): Uh. Yes. I'd like to report something I'm not supposed to know. You need to go to 3408 Wilma, Short Wilma, and there is a man dead there.

A. What is he dead from, do you know?

W. I just heard that someone had shot a guy last night and that's him. Everybody has left it. That is all I am saying but I feel sorry for a man being dead in that house all night.

A. OK, Uh could you tell me how you found out?

W. I overheard it. That's all I'll tell you right now.

A. You won't leave your name or anything?

W. No. __

A. Well, could you tell me who you heard the—done it? I mean . . .

W. No, because they'll tell you.

A. Who will tell us? Ma'am?

W. They'll tell you. I'm not supposed to have heard it. I don't want to get into it.

A. Well, I know, you know.

W. They have talked to their lawyers.

A. If we had somebody . . .

W. Listen, they are talking to their lawyers and they are going to tell you but so far nothing has been done but the man is dead. He is there on the couch.

A. OK. OK, now could you tell me. Start a car towards 3408 Short Wilma. Could you could you tell me the man's name because maybe they won't come forward and we are going to have to be looking.

W. I'll make sure. I'll make sure that they do. I promise. I will make sure if it is not told I will come forward.

During the call, Sgt. Adams dispatched Officer Larry Bunn to 3408 Short Wilma Street.

About the same time, Sgt. Danny Honeycutt radioed in for instructions, and the following conversation transpired.

H (Honeycutt). Let me talk to Kenneth Adams.

O (Officer). What is it this lady called in and we are supposed to have somebody who has been shot.

H. Where at?

O. 3408 Short Wilma.

H. At 3408 Short Wilma.

O. Uh-huh. I just told Larry Bunn, he was standing here. He has gone across to see if he could get a hold of 13 and go out there and check it.

H. 3408 South Wilma.

O. No, Short Wilma.

H. Short Wilma. OK. Thank you.

Honeycutt investigated and found no such residence as 3408

Short Wilma. Instead he went to nearby Wilma Street, which had a residence numbered 3408. Honeycutt testified that he walked onto the porch, knocked on the door, and received no response. He rang the doorbell a few times, still received no response, walked around the residence, spotted a neighbor and went to talk to him. He asked the neighbor if he had seen or heard anything that morning like shots, or someone leaving the house. The neighbor said he had heard nothing and Honeycutt returned to the porch as Sergeant Curtis Balch and Officer Larry Bunn arrived at the scene. Balch joined Honeycutt on the porch and Honeycutt tried the door. He found it unlocked, turned the knob, and pushed the door inward until it was caught by a chain. (The chain became controversial later. By the time Detective Caldwell arrived, the chain was broken, but no one admits breaking it. Honeycutt, though, indicates that it was intact when he opened the door.) Honeycutt stated that he had about a foot of vision into the house, and that he could see a couch and what appeared to be a body wrapped in a blanket on the floor in front of the couch. Honeycutt called into the house at that point, and someone yelled to the effect that they were all asleep and to "get the hell out." The two officers jumped off the porch with Balch yelling something like "come out with your hands up where we can see them." The officers did not identify themselves as policemen. Officer Bunn went to the back of the house and yelled that he thought someone was coming out of the back. Honeycutt ran to the back yard, and Mitchell, who is disabled and walks with a cane, had apparently exited from a back window and was limping away. (There was no back door.) Officer Bunn yelled at him to stop, which Mitchell did. Mitchell was then placed under arrest and taken to the police station.

After his arrest, but while the parties were still in the back yard, Detective David Caldwell arrived. He approached the other officers and was told by Honeycutt that there was a body on the floor in front of the couch, that the person may have been shot, and was possibly still alive. Caldwell said he opened the front door and found that the chain was attached to the door but was only draped over the wall bracket. He said he picked up the chain, undraped it from the wall bracket, opened the door, and entered the house. He said he checked the body. Finding the person dead, he then searched the house thoroughly for several hours. He had no search warrant. Besides the body, he found a .22 shell casing and

a footstool; both were introduced as evidence. No murder weapon was found at the time.

■ The trial court found the search and seizure legal, commenting that even if it was improper, the evidence would have been seized eventually and would be admissible under the inevitable discovery rule. This rule provides that despite unlawful police conduct, evidence should be admitted if it would have been inevitably discovered by lawful means. *Nix* v. *Williams*, 467 U.S. 431 (1984). The state must prove the "inevitable discovery" would have occurred by a preponderance of the evidence. In *Nix* the evidence established that independent searchers were approaching the actual location of the body, and that the search would have been resumed had the respondent not led the police to the body. The evidence would have inevitably been found. Here, the state offered no evidence of an independent search at the time the police unlawfully entered the residence. We can only speculate that the body would have been discovered. Therefore, the search cannot be upheld under this theory.

■ The warrantless entry into the Mitchell home clearly violated the fourth amendment's prohibition of unreasonable searches. (It matters not that the door was unlocked and the officer slightly opened the door to peek inside.)

■ To enter a residence or a private dwelling without a search warrant, two things must be present: probable cause and exigent circumstances. First, we deal with probable cause; that is, probable cause to believe that an offense has been or is being committed. *Michigan* v. *DeFillipo*, 443 U.S. 31 (1978). What is probable cause, or reasonable cause as A.R.Cr.P. Rule 14.3 provides? In *Brinegar* v. *U.S.*, 338 U.S. 160 (1948), the court said:

> [I]t has come to mean more than bare suspicion: Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed.

*See also Rowland* v. *State*, 262 Ark. 785, 561 S.W.2d 304 (1978); *Perez* v. *State*, 260 Ark. 438, 541 S.W.2d 915 (1976).

Recently, in *Illinois* v. *Gates*, 462 U.S. 213 (1983), the court emphasized that the probable cause standard is a "practical, nontechnical conception," quoting:

> 'The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.'

The court remarked that:

> As these comments illustrate, probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules. . . . Rigid legal rules are ill-suited to an area of such diversity. 'One simple rule will not cover every situation.'

In *Gates* the court abandoned the prior rigid rule for determining probable cause, which was established in *Spinelli* v. *United States,* 393 U.S. 410 (1969), and *Aguilar* v. *Texas,* 378 U.S. 108 (1964), and adopted instead a "totality of the circumstances" test. The court remarked that an anonymous letter standing alone probably would not provide a sufficient basis for probable cause, noting that the letter provided virtually nothing from which one might conclude that its author was honest or his information reliable. The anonymous telephone call in this case is even less revealing.

 Applying these principles to the facts before us, we ask: "Did Officer Honeycutt have probable cause to believe a felony had been committed in this house when he opened the door?" Regardless of what he personally knew, he is charged with the collective knowledge of the police department at the time. *Perez* v. *State, supra.* The police had received an anonymous phone call that a shooting had occurred at a certain address and that the person was dead. The caller emphasized that her concern was that the dead person was simply being allowed to remain in

the house. There was no information conveyed that would lead one to believe that the person might still be alive, or that anyone else was in danger. The identity of the caller was anonymous; one could only speculate as to the reliability of the caller. *See Burks* v. *State*, 293 Ark. 374, 738 S.W.2d 399 (1987), where we held that unverified, anonymous telephone calls cannot provide probable cause.

Furthermore, Honeycutt found that the reported address did not exist. He went to a different street with an identical number and knocked on a door. Getting no response, he inquired of a neighbor and learned no information that would indicate he had the correct house. Indeed, the neighbor indicated that he had not seen or heard anything. At this point, without a warrant, Honeycutt had no probable cause to believe a crime had been committed in this residence.

The constitution grants no privilege to the police to enter private homes without a search warrant except in well defined circumstances. Homes must remain closed to officers of the law until they have legal justification to open them.

In *Payton* v. *New York*, 445 U.S. 573 (1980), the United States Supreme Court said:

> As the Court reiterated just a few years ago, the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'

It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable.

Having determined that there was no probable cause here, we could stop our discussion, but the question of probable cause is closely interrelated to the question of the existence of exigent circumstances. The state contended below and argues to us that an emergency existed. What are exigent circumstances which will permit a search without a warrant? "Exigent" is defined as "requiring immediate aid or action." Webster's Third New International Dictionary (3d ed. 1981). *See also United States* v. *Hicks*, 752 F.2d 379 (9th Cir. 1985). While there is no definitive list of what constitutes exigent circumstances, there are several established examples. One of the most common examples in-

volves the risk of removal or destruction of evidence. *See Arkansas* v. *Sanders*, 442 U.S. 753 (1979). Another involves danger to the lives of the police officers involved or the lives of others. *Warden* v. *Hayden*, 387 U.S. 294 (1967). In addition, the hot pursuit of a suspect has been held to constitute exigent circumstances. *United States* v. *Haynie*, 637 F.2d 227 (4th Cir. 1980), *cert. denied*, 451 U.S. 972 (1981). None of these situations existed in this case. The strongest argument made by the state is that someone might be seriously injured in the house.

■ While Officer Honeycutt says that he opened the door to make sure the "body" was not alive, his entry was based on the anonymous phone call, which emphasized that the person in the residence was dead and had been for some time. Therefore, Honeycutt was simply not justified in thinking the person might still be alive. *Cf. Ortega* v. *State*, 669 P.2d 935 (Wyo. 1983). A common sense evaluation of the phone call could only lead to the conclusion that no one was in need of medical attention. Additionally, there was no danger to anyone until after the illegal entry was gained. If the police thought they had the right place and feared the removal or destruction of the body, they could have stationed officers nearby to prevent that while they obtained a warrant.

■ The police do not have a right to enter a residence to investigate the scene of a murder. The United States Supreme Court specifically rejected this idea in *Mincey* v. *Arizona*, 437 U.S. 385 (1977). In rejecting this exception to the requirement of a warrant, the court recognized the importance of the police's ability to respond to emergency situations, and pointed out that the fourth amendment does allow a warrantless entry and search when the police reasonably believe that someone within a residence is in need of immediate aid. However, as the court also pointed out, allowing warrantless searches of a murder scene would lead to allowing warrantless searches of all crime scenes. While this would simplify criminal investigations, it would not justify disregarding the fourth amendment. The state was unable to prove any exigent circumstances existed in this case.

■ Since the entry of Mitchell's home was illegal, all the evidence seized as a result of that intrusion must be excluded. If Honeycutt had not discovered a body in the house, Mitchell

would not have fled and been arrested; likewise, Detective Caldwell would not have entered the home that morning, and his intensive search would not have occurred. Therefore, the evidence obtained, the shell casing and footstool, should have been suppressed. Mitchell's statement must also be suppressed since it, too, was obtained as a direct result of the illegal entry. *Wong Sun v. U.S.*, 371 U.S. 471 (1963). The murder weapon, a .22 caliber pistol, and a hand grenade may be used against Mitchell on remand. They were properly seized later when Mitchell's brother called the police and surrendered the items.

Mitchell's brother was the only other witness to the killing, but neither side called him to testify. Mitchell eventually testified at trial, once his statement and the evidence against him were admitted. His testimony did not depart dramatically from his statement to the police. Mitchell, his brother, and Ronald Sisk were sitting in the Mitchells' living room, talking and drinking until the early hours of the morning. Sisk was an old friend of Mitchell's, and the two had not seen each other in almost seven years. Sisk had been telling the Mitchell brothers about his new job teaching people how to use hand grenades and other similar weapons. Mitchell said Sisk told them he was going to teach people to "exterminate with extreme prejudice." Sisk had had a hand grenade displayed earlier in the evening, playing with it, and had asked to look at the Mitchells' gun. At some point, after midnight, when they were drunk and apparently dozing off, Mitchell says he heard Sisk say "exterminate with extreme prejudice." He looked up, and Sisk had a hand grenade and was pulling the pin out. Mitchell says his only thoughts were that he and his brother were about to be killed, so he reached for the gun and shot Sisk in self-defense. He claims that he had no other choice. The jury obviously rejected his story and found him guilty of first degree murder.

The remaining issues in this case will not likely arise at another trial. Mitchell's attorney tried to get the results of a trace metal test introduced through the wrong witness; he did not lay a proper foundation. The state asked a question and made a remark about Mitchell's brother's version of what happened. Undoubtedly, the state will have to call the brother to testify at a retrial, and these questions will not arise again.

Reversed and remanded.

HAYS, J., dissents.

STEELE HAYS, Justice, dissenting. I see the issue as simply whether police conduct in opening the door as far as the chain latch would permit, *with no actual entry*, was unreasonable under the circumstances. *Rabinowitz* v. *United States*, 339 U.S. 556 (1950).

It is clear that police powers are broader in emergency situations. *Katz* v. *United States*, 389 U.S. 347 (1967); *United States* v. *Rabinowitz, supra*. Those situations include saving lives and preserving evidence. Hence, the emergency doctrine is said to encompass the doctrine of "hot pursuit." *Warden* v. *Hayden*, 387 U.S. 294 (1967).

The police action in this instance can be defended on either ground. While the anonymous caller may have assumed the victim was already dead, her message was ambiguous, indicating that she knew "just that someone had shot a guy last night and that's him." Whatever her assumption may have been, the police are not limited to inferences that would thwart prompt action, especially when experience teaches that on occasion people thought to be dead, are not. *See Ruiz & Van Denton* v. *State*, 273 Ark. 94, 617 S.W.2d 6 (1981), for example. Officer Honeycutt testified that his purpose in opening the door was to determine if the victim was, in fact, dead. The majority opinion effectively denies the victim the benefit of any doubt. I believe the officer was justified under the law in taking the simple expediency of opening an unlocked door so far as its latch would permit. A.R.Cr.P. Rule 14.3. Had Ronald Sisk been still alive the propriety of the police action would hardly be questioned. I fail to see why we should adopt a rule that discourages, rather than promotes, timely methods by the police to safeguard society. Other jurisdictions have not been hesitant to hold accordingly. *Ortega* v. *State*, 669 P.2d 935 (Wyo. 1983); *State* v. *Epperson*, 571 S.W.2d 260 (Mo. 1971); *State* v. *Hardin*, 90 Nev. 10, 518 P.2d 151 (1974); *People* v. *Brooks*, 7 Ill. App. 3d 767, 289 N.E.2d 207 (1972). I would affirm the trial court.