Chancey Lynn BAIRD *v.* STATE of Arkansas

CA CR 02-757                                            128 S.W.3d 459

Court of Appeals of Arkansas
Divisions I and IV
Opinion delivered November 12, 2003

*James Law Firm*, by: *William O. James* and *Clay T. Buchanan*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Brad Newman*, Ass't Att'y Gen., for appellee.

LARRY D. VAUGHT, Judge. This is an appeal from the Washington County Circuit Court in which appellant Chancey Baird was convicted of attempted first-degree murder and sentenced to thirty years' imprisonment in the Arkansas Department of Correction and to a fine of $15,000. On appeal, appellant argues that the trial court erred by denying his motions to suppress the physical evidence recovered from the residence and the statements he gave to police following his arrest. We reverse and remand for a new trial.

On February 7, 2001, at approximately 5:30 a.m., Officer Jason Hiatt of the Elm Springs Police Department received a call requesting that he go to the hospital in Springdale regarding an assault on Jessica Gamblin. While at the hospital, Officer Hiatt heard Ms. Gamblin say the name "Chancey" in reference to the person who had assaulted her. He assumed she was referring to appellant Chancey Baird. Officer Hiatt also talked with two other police officers at the hospital who confirmed that she had identified appellant as her attacker.

Officer Hiatt then contacted Chief Kenneth Martin of the Elm Springs Police Department, who came to the hospital. Upon reviewing the comments made by Ms. Gamblin, Chief Martin agreed that she was referring to appellant as her attacker. Chief Martin, Officer Hiatt, Deputy McAffe of the Washington County Sheriff's Department, and two other officers then proceeded to appellant's mobile home, allegedly to arrest him, to check for other victims, and to secure the scene. They arrived approximately one hour subsequent to Officer Hiatt's original notification of the attack.

Upon arriving, Chief Martin, Officer Hiatt, and Deputy McAffe went to the front door. Officer Hiatt and Chief Martin testified that they both saw what appeared to be blood droplets on the front door facing, and a smear of blood near the door, although they disagreed as to the number of droplets of blood and whether they were wet or dry. Chief Martin stated that the officers did not know how many people had been at the house and were concerned there might be other victims.

Officer Hiatt knocked on the front door and yelled "police," but received no response. The officers testified that the lights were on and the television was playing loudly. Chief Martin then knocked harder on the door, and the unlatched door opened slightly. Chief Martin then entered the residence and noticed appellant's brother, Brent Baird, asleep on the couch. Officer Hiatt and Deputy McAffe followed Chief Martin into the residence. Chief Martin called out Brent Baird's name, and he sat up to respond. After confirming that Brent was alright, Chief Martin asked Brent where his father, Buddy, was. Brent pointed to a bedroom that was located behind the officers off of the living room. There is no evidence that officers ever asked Brent if anyone at the residence had been injured.

Chief Martin then walked over to the bedroom, pushed the door open, and went in followed by Officer Hiatt and Deputy McAffe. They found Buddy Baird asleep, called out his name, and after receiving no response, awakened him by shaking his foot. Chief Martin noticed what appeared to be a blood stain on Buddy's shirt, but Buddy then called Chief Martin by name and confirmed that he was also okay. Chief Martin asked Buddy where appellant was, to which he responded that, if appellant was there, he was probably in the back bedroom. Chief Martin then explained to Buddy that Jessica Gamblin had been hurt and that they were looking for appellant. He asked if they could check the residence and garage. Buddy told Chief Martin that he could "look where you want to."

The three officers proceeded down a hallway to appellant's bedroom. Along the way, they noticed a shirt on the floor that appeared to have blood stains on it.[1] Officer Hiatt and Deputy McAffe, followed by Chief Martin, entered appellant's bedroom where they found appellant sleeping. They awakened appellant, and then Officer Hiatt placed him under arrest, handcuffed him, took him outside the residence, and placed him in the patrol vehicle.

Chief Martin exited the residence and then went to the garage. Outside of the garage, he saw a large puddle of blood in the gravel, and a "drag mark" with blood going into the garage. Chief Martin then entered the open door to the garage, where he saw "numerous clumps of clotted blood" on the floor, as well as on the front of an automobile parked in the garage. He testified that his main purpose for entering the garage was to see if any injured persons were inside.

Officer Hiatt then returned to the Elm Springs Police Department to get a consent to search form, which was subsequently signed by Buddy Baird. The form gave officers consent to search the garage, the front of the house, appellant's bedroom, and the bathroom and hallway in the rear of the residence. After additional investigators arrived to process the crime scene, Chief Martin determined that it would take some time to process everything, so he obtained a search warrant for the residence and garage.

---

[1] According to Officer Hiatt's testimony, the shirt was the only item of evidence found inside the residence.

After the warrant was obtained, crime scene investigators collected the evidence seen earlier by Chief Martin in addition to other evidence discovered during their search. Appellant was first questioned by Detective Rexford at the crime scene, and then again later that day he was interviewed on two occasions by law enforcement authorities.

Appellant filed a motion to suppress both the physical evidence recovered from his residence and the statements he gave to the police following his arrest. The motions were based on the theory that the entry into appellant's home was warrantless and without exigent circumstances, and therefore illegal. The argument was that, because the entry was illegal, anything that flowed directly from the illegal entry was "fruit of the poisonous tree" and subject to suppression. The trial court denied both the motion to suppress the evidence and the motion to suppress appellant's statements. Regarding the denial of appellant's motion to suppress the evidence collected, the trial judge noted that a search warrant was issued, indicating that the officers had probable cause to conduct a search. He also credited Chief Martin's testimony that he was concerned that other victims might have been at appellant's residence, particularly after authorities noticed blood on the front door of the house in the course of an investigation of a possible murder. The trial judge found that the officers' entry into the residence was permissible based on exigent circumstances, and that they obtained Buddy Baird's consent before proceeding to appellant's bedroom.

### Standard of Review

In reviewing the trial court's denial of a motion to suppress evidence, we conduct a de novo review based on the totality of the circumstances, reviewing findings of historical facts for clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by the trial court. *Cummings v. State*, 353 Ark. 618, 631, 110 S.W.3d 272, 279 (2003) (citing *Davis v. State*, 351 Ark. 406, 94 S.W.3d 892 (2003)).

### A. Exigent Circumstances

Appellant contends that the trial court erred in denying his motion to suppress all physical evidence that was obtained from his residence, arguing that three officers entered his

residence with the intention of arresting him with neither a warrant nor under exigent circumstances. A warrantless entry into a private residence is presumptively unreasonable under the basic principles of the Fourth Amendment. *See Payton v. New York*, 445 U.S. 573 (1980); *Norris v. State*, 338 Ark. 397, 993 S.W.2d 918 (1999). The United States Supreme Court wrote in *Payton, supra*:

> [T]he physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.

> \* \* \*

> The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home — a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their . . . houses . . . shall not be violated." That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." [Citation omitted.] In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

*Holmes v. State*, 347 Ark. 530, 537, 65 S.W.3d 860, 863-864 (2002) (quoting *Payton*, 455 U.S. at 585-86, 589-90). Further, the United States Supreme Court has noted that "[w]ith few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." *Kyllo v. United States*, 533 U.S. 27, 31 (2001). The burden is on the State to prove that the warrantless search was reasonable. *Wofford v. State*, 330 Ark. 8, 952 S.W.2d 646 (1997). In order to justify a warrantless felony arrest inside a residence, the State must show that both probable cause and exigent circumstances exist. *See Payton v. New York, supra; Mitchell v. State* 295 Ark. 264, 742 S.W.2d 895 (1988).

Arkansas Rule of Criminal Procedure 14.3 (2003) sets forth the emergency searches/exigent circumstances exception to the warrant requirement, stating:

An officer who has reasonable cause to believe that premises or a vehicle contain:

(a) individuals in imminent danger of death or serious bodily harm; or

(b) things imminently likely to burn, explode, or otherwise cause death, serious bodily harm, or substantial destruction of property; or

(c) things subject to seizure which will cause or be used to cause death or serious bodily harm if their seizure is delayed; may, without a search warrant, enter and search such premises and vehicles, and the persons therein, to the extent reasonably necessary for the prevention of such death, bodily harm, or destruction.

The State argues that there were exigent circumstances that night that afforded them an exception to the warrant rule, namely the officers' concern that other victims might be inside appellant's residence. Appellant maintains that although Chief Martin testified as to his concern for additional possible victims, the officers failed to inquire about other victims once inside the residence, and left the residence once appellant had been apprehended.

Even prior to the actual arrival and entry at appellant's home, there is evidence that the focus of the police was not directed toward other potential victims. The evidence is clear that subsequent to being called to the hospital around 5:30 a.m. to interview Ms. Gamblin, Officer Hiatt discussed the case with other officers present, called Chief Martin, and waited for him to arrive and assess the situation. Appellant points out that neither Officer Hiatt nor the other officers went directly to the Baird residence. They did not dispatch any other officers to the scene and instead waited for Chief Martin to arrive. It appears that it took approximately one hour[2] from the time Officer Hiatt learned of the alleged attack by appellant to the time he and the other officers went to

---

[2] The dissent states that Officer Hiatt testified that they went to the residence "on or around 6:00." He actually said "it was after six in the morning, at or around six in the morning." After further questioning by the court Officer Hiatt confirmed that he was there roughly an hour after visiting with the witness at the hospital. Whether it was thirty minutes or an hour, it is undisputed that no officers were immediately dispatched.

appellant's residence. Additionally, there is no testimony that Officer Hiatt believed there were other victims.

The conflicting testimony presented regarding the scene at appellant's house also bolsters appellant's argument that the exigent circumstances exception was not appropriate in this case. All three officers who testified gave differing accounts regarding the bloodstains on the front door frame: (1) Chief Martin testified they were dry; (2) Officer Hiatt testified that he thought they were wet; (3) Detective Rexford did not even notice them. Detective Rexford, the crime-scene investigator who collected the evidence, testified specifically that he noticed dark stains on the porch, but that they were not unusual for that type of residence. He did not testify that the stains were bloodstains, and did not photograph them as evidence of importance to the processing of the scene. At most, the evidence showed that officers noticed a very small amount of blood upon arrival at the front door of appellant's residence. The officers had just come from the hospital where they had seen first-hand the extent of the victim's injuries. Even viewing the testimony regarding the blood evidence in the light most favorable to the State, what they saw was consistent with the known attack against the victim and would not necessarily give rise to a reasonable belief that someone else was in imminent danger.

Additionally, Chief Martin testified that he was never given any indication that there were other victims in addition to Ms. Gamblin. When asked why he did not procure a warrant before going to appellant's residence, he testified that he did not need one because he had probable cause based on the victim's statements at the hospital. Appellant argues that this testimony confirms that Chief Martin already had the idea that he had a right to enter appellant's residence and arrest him before he arrived on the scene based on probable cause, not because of any belief that an individual was in imminent danger of death or serious bodily injury. He asserts that such reasoning is inconsistent with both *Payton, supra,* and *Mitchell, supra,* which require the State to show that both probable cause *and* exigent circumstances exist in order to justify a warrantless felony arrest inside a residence.

The trial judge determines the credibility of witnesses who testify at a suppression hearing, and this court defers to the trial judge's superior position to determine credibility. *Fairchild v. State,* 349 Ark. 147, 76 S.W.3d 884 (2002). Additionally, in

conducting a clear-error review on factual issues, we defer to the trial court's resolution of conflicting testimony and its assessment of witnesses' credibility. *Lamb v. State,* 77 Ark. App. 54, 70 S.W.3d 397 (2002). However, based upon the totality of the circumstances standard, it was speculative, at best, for the officers to claim exigent circumstances as justification for their entry. This court has held that speculative or potential harm is not sufficient to show imminent harm and is insufficient to justify exigent circumstances. *Starks v. State,* 74 Ark. App. 366, 49 S.W.3d 122 (2001).

██    Rule 14.3(a) (2003) of the Arkansas Rules of Criminal Procedure requires an officer to have reasonable cause to believe that premises contain individuals in imminent danger of death or serious bodily harm in order to justify a warrantless entry into a residence. Although Chief Martin testified that he was looking for other possible victims at appellant's residence, the evidence does not support the conclusion that he had reasonable cause to believe there were individuals in imminent danger of death or serious bodily harm at the residence. The police waited over an hour before proceeding to the residence. They never received information from anyone, including the victim, that there might be other potential victims at appellant's residence. The amount of blood police officers saw upon their arrival at the residence was small in amount and would not give rise to any indication that an attack, other than the known assault against Ms. Gamblin, had recently occurred at the residence. Even upon entry into the residence, officers failed to ask either Brent or Buddy Baird if there were other potential victims. They simply verified their respective conditions and then inquired as to appellant's location. Chief Martin's general statements regarding his concern for other victims are insufficient to establish reasonable cause in light of all the contradictory evidence. We therefore hold that the warrantless entry into the residence cannot be sustained based on exigent circumstances.[3]

---

[3] The dissent's reliance on *Humphrey v. State,* 327 Ark. 753, 940 S.W.2d 860 (1997), to support the warrantless entry in this case is misplaced. In *Humphrey,* the court found valid consent by the appellant's grandmother and analyzed exigency as a secondary issue. Even so, in *Humphrey,* the officers heard the gunshots, had two victims down, and immediately proceeded to the residence to apprehend the shooter. The supreme court rightfully found exigent circumstances in that situation. Here, the victim identified appellant, and the police

Having concluded that the initial entry into appellant's home was unlawful, all evidence obtained which flowed directly from the unlawful entry must be excluded under the "fruit of the poisonous tree" doctrine. *See Wong Sun v. United States*, 371 U.S. 471 (1963) (providing that evidence obtained by the exploitation of a primary illegality must be excluded).

## B. Consent

Buddy Baird's consent to "look where you want to" was given after the officers' illegal entry into the home, and generally, consent to search obtained after an illegal search has begun is not valid and cannot remove the taint of the illegal search. *Griffin v. State*, 347 Ark. 788, 67 S.W.3d 582 (2002). While federal case law recognizes that a search preceded by a Fourth Amendment violation may still be valid if a defendant's consent to that search was voluntary in fact under the totality of the circumstances, the government bears a heavy burden of showing that the primary taint of that violation was purged, proving a sufficient attenuation or break in the causal connection between the violation and the consent. *See United States v. Reyes-Montes*, 233 F. Supp. 2d 1326 (D. Kan. 2002). The factors set out in *Brown v. Illinois*, 42 U.S. 590 (1975), have been used in reviewing the totality of the circumstances: (1) the temporal proximity of the illegal entry and consent; (2) any intervening circumstances; (3) the purpose and flagrancy of any official misconduct.

Under the facts of the instant case, the consent was obtained from appellant's father shortly after the officers' illegal entry. They awakened appellant's brother, who indicated his father's location by pointing to a bedroom located off of the living room. They immediately entered appellant's father's bedroom and awakened him, asking about appellant's whereabouts. There were no intervening circumstances to "break the causal connection" or eliminate the coercive effects of the unlawful entry. Regarding the purpose and flagrancy of the officers' misconduct, the officers may have been well-intentioned, but as noted in *Reyes-Montes, supra*, "a

---

(who knew appellant and his family) waited close to an hour while assembling everyone at the hospital and then proceeded to appellant's residence. There was no indication of anything other than a stabbing by a friend or acquaintance, and no pursuit of a fleeing shooter as in *Humphrey*.

warrantless entry into a house is presumptively unreasonable, and the physical entry of the house is the chief evil against which the Fourth Amendment is directed." *United States v. Reyes-Montes*, 233 F. Supp. 2d at 1331.

In the present case, the State argues that because Buddy consented to the search of the residence, the search was constitutionally permissible. We cannot agree with this assessment. Buddy did not verbally consent to the search until after the illegal entry had occurred and did not sign the written consent-to-search form until after appellant had been arrested and significant evidence had been found. In *Holmes v. State, supra*, the supreme court affirmed this court's reversal of the defendant's conviction, correctly reciting the "fruit of the poisonous tree" doctrine. Consequently, based on the totality of the circumstances, we conclude that the trial court erred in denying appellant's motions to suppress the evidence collected at appellant's residence.

### C. The Search Warrant, Appellant's Statements, and the Garage

The State argues that appellant does not challenge the validity of the search warrant on appeal, and therefore all evidence illegally obtained prior to the issuance of the warrant would have been inevitably discovered by the warrant. We disagree. Appellant challenges the admission of all physical evidence and alleges that everything flowing from the illegal entry is tainted. This includes the warrant because the affidavit for the warrant was based entirely on appellant's statements, and the warrant must fall if the statements were illegally obtained.

Appellant asserts that any statement made from a suspect following an unlawful arrest is "fruit of the poisonous tree" and subject to suppression. *See Wong Sun v. United States, supra*. Based on the facts of this case, specifically that appellant was awakened by the three officers, immediately put in restraints, and taken from his residence to the rear of the patrol car until subsequently interviewed, the statements were not obtained by means sufficiently distinguishable to be purged of the primary taint. He was continuously in custody from the moment he was awakened (approximately 6:30 a.m.) through three sets of officer interviews, which concluded at approximately 10:30 a.m. There were no intervening factors of free will sufficient to remove the taint of the illegal arrest as set forth in *Wong Sun, supra*. Accord-

ingly, we find that the trial court erred and the appellant's statements should have been suppressed.

It follows that the affidavit for the search warrant must fall because it was based on the tainted statements of appellant. Moreover, while the victim's statement might have been sufficient to justify a warrant, it was not included in the affidavit and cannot be used as an independent source after the fact. The first prong of the test for inevitable discovery is whether, after excising the tainted material, the affidavit is sufficient to support the issuance of the warrant. *Lauderdale v. State*, 82 Ark. App. 474, 120 S.W.3d 106 (2003). Obviously, it is not sufficient here where only tainted material was used.

Additionally, we disagree with the State's contention that the evidence seized from the garage is admissible. Although there was blood that might have been visible from outside the garage, by his own testimony, Chief Martin admits that he went out to the garage after appellant had been arrested and removed from the residence. No additional information had been discovered that indicated that there might be additional victims in the garage. The garage was located next to the residence and used as a garage, and was therefore subject to the same expectation of privacy as curtilage. *See Norman v. State*, 326 Ark. 210, 931 S.W.2d 96 (1996); *State v. Cashion*, 260 Ark. 148, 539 S.W.2d 423 (1976). Absent exigent circumstances, valid consent, or a valid warrant, entry into the garage was also prohibited.

*D. Harmless Error*

The State argues harmless error based on the victim's identification of appellant and account of the attack. *See Johnson v. State*, 337 Ark. 477, 989 S.W.2d 525 (1999) (finding that even the erroneous admission of evidence is not prejudicial and is harmless error where there is overwhelming evidence supporting the conviction). While there may be sufficient additional evidence to convict appellant, we cannot say that the admission of all the physical evidence and appellant's confession, which were obtained as "fruit" of the unlawful entry, search, and arrest, was harmless error.

Reversed and remanded.

STROUD, C.J., and ROBBINS, GRIFFEN, and NEAL, JJ., agree.

BIRD, J., dissents.

SAM BIRD, Judge, dissenting. I respectfully dissent from the majority opinion because I believe that the majority has incorrectly applied the law in concluding that the police officers' entry into the Baird residence was unlawful. Police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home. *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) (citing *Payton v. New York*, 445 U.S. 573 (1980)). An important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made. *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984). While conducting legitimate emergency activities, the police may seize any evidence that is in plain view. *Mincey v. Arizona*, 437 U.S. 385, 393 (1978). The Supreme Court wrote the following explanation of its holding in *Mincey*:

> We do not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. Similarly, *when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises. Cf. Michigan v. Tyler, supra,* 436 U.S., at 509-510, 98 S.Ct., at 1950-1951. "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Wayne v. United States,* 115 U.S. App. D.C. 234, 241, 318 F.2d 205, 212 (opinion of Burger, J.).

437 U. S. at 392-93 (footnotes omitted, emphasis added).

In *Humphrey v. State*, 327 Ark. 753, 940 S.W.2d 860 (1997), Officers Bobby Bozarth and Willie Dinwiddie of the Augusta Police Department heard shots fired, drove to the area where the shots had originated, and discovered the bodies of a murder victim and a wounded survivor. The survivor and another individual identified Humphrey as the perpetrator of the crime, but the officers called Woodruff County Sheriff Jack Caperton and waited for his arrival before going to the nearby house where Humphrey resided with his grandmother. Appellant Humphrey argued, as

does the appellant in the present case, that under *Payton v. New York*, 445 U. S. 573 (1980), officers lacked reasonable cause to arrest and lacked exigent circumstances to justify the warrantless entry into his home. The supreme court rejected this argument on the following basis:

> Exigent circumstances are those requiring immediate aid or action, and, while there is no definite list of what constitutes exigent circumstances, several established examples include the risk of removal or destruction of evidence, danger to the lives of police officers or others, and the hot pursuit of a suspect.

> . . . .

> In the present case, murder had been committed, clearly a most grave offense. Since the victims were shot and no murder weapon was immediately apparent at the crime scene, the officers had good reason to believe that the suspect was armed and dangerous. Additionally, Bozarth and Dinwiddie testified that they heard gunshots at about 3:35 a.m., and Caperton testified that they arrived at the residence at 4:21 a.m., less than an hour after the shootings. As discussed above, the officers had strong probable cause to believe that Humphrey was the perpetrator. Dinwiddie also knew that Humphrey lived with his grandmother, giving the officers a strong reason to suspect that Humphrey was in the premises being entered. Under these particular facts, we conclude that sufficient exigent circumstances existed to justify a warrantless entry into the home, even if [the suspect's grandmother] did not consent to the entry.

327 Ark. 753, 767-78, 940 S.W.2d 860, 867-68 (1997), citing *Butler v. State*, 309 Ark 211, 829 S.W.2d 412 (1992), and *Gaylor v. State*, 284 Ark. 215, 681 S.W.2d 348 (1984).

In the present case, the trial court's ruling on the suppression issue included the following:

> As to the arrest, in my judgment, the totality of the circumstances and the undisputed testimony of Chief Martin that he was concerned there were other victims in the home. Whatever was on the doorframe, it appeared to him, a veteran police officer of over twenty-five years, that there was blood at that location and on those objects. The door comes open, it's not latched, and he sees a person inside who is apparently either dead or asleep. He doesn't say that

but clearly the implication to me is clear that they're concerned about possible additional victims. . . .

I understand your issue about the entry into the house but in my view the initial entry into the house by the police officers was clearly the result of the exigent circumstances and permissible in this particular fact situation. Once they were in the house clearly they had the homeowner's permission to proceed to the bedroom where the Defendant was observed and later arrested. So the motions are denied.

The standard of review for a trial court's action granting or denying motions to suppress evidence obtained by a warrantless search requires that we make an independent determination based upon the totality of the circumstances, giving respectful consideration to the findings of the trial judge. *Davis v. State*, 351 Ark. 406, 94 S.W.3d 892 (2003). We give considerable weight to the findings of the trial judge in the resolution of evidentiary conflicts, and we must defer to the superior position of the trial judge to pass upon the credibility of witnesses. *Id.*, citing *State v. Osborn*, 263 Ark. 554, 566 S.W.2d 139 (1978).

Here, the majority opinion agrees with appellant that "neither Hiatt nor other officers went directly to the Baird residence." The majority recites that Officer Hiatt was called to the hospital at 5:30 a.m. but ignores his testimony that after Chief Martin came to the hospital, the two of them and Deputy McAffee went to appellant's residence and arrived "at or around" 6:00 a.m.

Chief Martin testified that there were drops of blood on the door facing and "a smear where someone had drug their hand or fingers or something but it was high enough. . . it would have to have been a hand. That's another reason I was concerned about the people inside." His further testimony contradicts the majority's assertion that there was no evidence of officers' asking Brent if anyone at the residence had been injured:

I called out to Brent and he sat up. *I asked him if he was okay and he said he was.* I asked where his dad and Chancey were and he said, "Dad is in there," pointing to the bedroom almost adjoining the front door. Officer Hiatt and Deputy McAffee stepped in the mobile home. I pushed the door open and called to Buddy four or five times. He was lying face down on the bed fully clothed. I got no response. I walked closer and shook his foot. That's when he rolled

over and called me by name. I noticed what I believed was blood on his shirt from a finger or hand. *I asked if he was okay and he said he was.* I asked him where Chancey was and he said, "If he's here he's in the back bedroom."

(Emphasis added.) It is clear that the trial court believed this testimony about blood at the doorway, an unresponsive person inside, and concern for possible victims other than the girlfriend who had been cut up so badly that a hospital doctor had predicted that "she was probably not going to make it."

Probable cause, which is probable cause to believe that an offense has been or is being committed, is closely interrelated to the question of the existence of exigent circumstances. *Mitchell v. State*, 294 Ark. 264, 742 S.W.2d 895 (1988). Exigent circumstances are those requiring immediate aid or action: one established example is danger to the lives of police officers or others. *Butler v. State*, 309 Ark. 211, 829 S.W.2d 412 (1992). The Fourth Amendment does allow a warrantless entry and search when the police reasonably believe that someone within a residence is in need of immediate aid. *Mitchell v. State, supra* (citing *Mincey v. Arizona, supra*).[1]

Here, the officers had probable cause to arrest appellant, who had been named by the victim as the perpetrator of this serious crime. Within as little as half an hour, they arrived at his residence, with strong reason to believe that he was there. The

---

[1] In *Mitchell v. State*, 294 Ark. 264, 742 S.W.2d 895 (1988), a police sergeant investigated a mid-morning, anonymous telephone call that said that a man had been dead all night in a house at 3408 Short Wilma Street in Fort Smith. Finding no such address, the sergeant instead went to nearby 3408 Wilma Street, where he knocked and received no response. He walked around the residence and asked a neighbor whether he had heard anything or seen anyone leaving, but the neighbor had not.

The officer turned the knob of the unlocked door and pushed it inward until it was caught by a chain. He saw what appeared to be a body wrapped in a blanket on the floor in front of the couch. He called into the house, and someone yelled "to get the hell out." Mitchell, who apparently had exited from a back window, was seen leaving and was arrested. The supreme court, addressing whether the officer had probable cause to believe that a felony had been committed when he opened the door of Mitchell's residence, found that the warrantless entry was a violation of the Fourth Amendment. The supreme court further found that a common sense evaluation of the phone call could only lead to the conclusion that no one was in need of medical attention, and that the State had not proven the existence of exigent circumstances.

weapon used in committing this serious crime had not been found, and the officers collectively had seen the victim's gruesome injuries, blood on the doorframe of the residence, and a person either dead, unconscious, or asleep in the first room beyond the unlatched door. Given these observations, there was reasonable cause for Officer Martin's belief that there might be other victims,[2] and thus the officers' entry into appellant's home came within the exigent-circumstances exception to the warrant requirement of the Fourth Amendment.

I would affirm the trial court's denial of the motion to suppress.

---

[2] The majority, citing *Starks v. State*, 74 Ark. App. 66, 49 S.W.3d 122, (2001), characterizes Chief Davis's claim of exigent circumstances as "speculative, at best." The historical facts of *Starks* and the present case are quite different.

Officers in *Starks* were called to a shooting at a residence. An individual opened the door, pointed inside, and said, "He's in the back." Officers went in and found Starks, who had been shot, lying in the doorway of a back bedroom. A sergeant securing the scene immediately found a nine-millimeter pistol and several nine-millimeter shell casings. He also found a .40 caliber shell casing and an empty pistol case, and an infant child was found in the residence. After Starks was taken away to get medical attention, the sergeant re-entered the back bedroom to look for the .40 caliber pistol. He found items that led to Starks's conviction for possession of cocaine.

This court found that Starks's need for medical attention justified the initial entry into his residence; however, we agreed with his argument that the search for the pistol was not justified when the premises were already secure and only police personnel were present. We found that that the circumstances had changed when Starks was taken away by ambulance, when the harm became potential or speculative rather than imminent. We held that the officer's re-entry into the back bedroom exceeded the scope of his emergency duties, and that his expressed intention to make the premises safe for small children before turning it over to "family members" waiting outside did not justify searching the house for a weapon.