UNITED STATES of America,
Plaintiff,

v.

Jose REYES–MONTES, and Carolina
Herrera–Ortega, Defendants.

Nos. 02–10112–01, 02.

United States District Court,
D. Kansas.

Nov. 1, 2002.

Charles A. O'Hara, O'Hara, O'Hara, & Tousley, Timothy J. Henry, Peter J. Orsi, Douglas L. Adams, Jr., Wichita, KS, for Defendants.

D. Blair Watson, Wichita, KS, for Plaintiff.

**Memorandum and Order**

WESLEY E. BROWN, Judge.

This matter came before the court on October 24, 2002, for an evidentiary hearing on the defendants' motions to suppress evidence. The court took the motions under advisement at the conclusion of the hearing and granted the parties until October 31, 2002, to file additional briefs. The court has reviewed the briefs and is prepared to rule.

The motion to suppress concerns a search of the defendants' residence by Wichita police officers in the early morning hours of July 19, 2002. The defendants contend that the officers entered the home without a warrant and without obtaining consent to enter. They further contend a purported consent from Mr. Reyes to let the officers look through the house was involuntary and was tainted by the illegal entry. The government contends that the officers obtained voluntary consent from the defendants to enter the home and to search it.

I. Facts.

The evidence at the hearing showed the following facts. On the evening of July 18, 2002, members of the Wichita Police Department's Special Investigations Bureau, including Sergeant Daniel East, arranged to have an undercover police officer attempt to purchase methamphetamine from an individual named Ronald Howe, whom they suspected of dealing drugs. At some point in the transaction, Howe indicated that his supplier was an individual the police recognized as Jose Treto. According to Sgt. East, the police knew that Treto met with Howe that evening and then left Howe's location to obtain methamphetamine for Howe. Treto and his wife were seen by police stopping at a residence at 822 S. Mission Street in Wichita, after which they returned to Howe's location. (The testimony did not establish exactly when Treto stopped at this residence, but one officer testified it was getting dark at the time, which probably placed it around 9:30 p.m.). Howe and Treto were subsequently arrested and a quantity of methamphetamine was recovered.

Later in the evening, at about 12:30 a.m. (the early morning hours of July 19th), Sgt. East and Detective Edwin Melon–Moran met near the residence at 822 S. Mission together with two uniformed Wichita Police Officers. Sgt. East and Detective Melon–Moran were dressed in plain clothes, but they wore police badges on chains around their necks so that the badges were plainly visible. All of the officers were armed, although East and Melon–Moran had their firearms concealed beneath their clothing. The officers suspected that Treto may have obtained the methamphetamine from the residence at 822 S. Mission. Sgt. East decided to do a "knock and talk" at the residence, meaning they would knock on the door and talk to the residents in the hope of getting consent to search the house. The officers did not discuss the possibility of obtaining a search warrant or conducting additional surveillance, nor did they discuss waiting until daylight hours to approach the house. The officers were aware from a prior case that the residents of the house were of Hispanic descent. Detective Melon–Moran is fluent in both Spanish and English. He was wearing jeans and boots on the night in question. He is about 6'2" tall.

At about 12:40 a.m., uniformed officer Kevin Real approached the residence and knocked on the door. There was an outer aluminum-framed screen door on the house, with some or all of the screen missing, and an inner wooden front door. Real saw some lights on in the house. He was standing on a small concrete porch. Real does not remember if a porch light was on. Sgt. East and Det. Melon–Moran were a few feet behind Real just off the porch. The other uniformed officer (Officer Tucker) went around towards the back of the residence.

Officer Real obtained no answer so he knocked several times on the door. Eventually he saw a small boy looking out a window near the front door. The evidence indicates that the boy, who was eight years old, called in the house to his mother, Carolina Herrera–Ortega, telling her there were "two white guys at the door." Ms.

Herrera was sleeping in a bedroom in the house when she heard her son call. The boy came to the front door and opened it. Officer Real said "hi" to the boy, just as Ms. Herrera appeared at the door behind her son. She was dressed in only a night shirt and some shorts. Officer Real testified that he asked Ms. Herrera, in English, if they could step in and ask her some questions. He said she looked at him as if she did not understand, so he stepped back off the porch and spoke to Sgt. East, who asked Detective Melon–Moran to speak to the woman.

Ms. Herrera testified that upon reaching the door she scolded her son for opening it to strangers, and she began to close the wooden door when Detective Melon–Moran impeded the closing of the door with his hand and showed her his police badge. Detective Melon–Moran denied impeding the closing of the door in any way.

Detective Melon–Moran testified that he stepped up to the door and told Ms. Herrera in Spanish they were conducting a follow-up drug investigation and said he would like to talk to her. (All of Detective Melon–Moran's conversations with the defendants that evening were in Spanish.) Melon–Moran testified that while he was talking to Ms. Herrera, her husband, defendant Jose Reyes–Ortega, appeared from inside and came to the door. Reyes had apparently just gotten out of the shower, and was wearing only a towel. Melon–Moran testified that he repeated to Mr. Reyes what he had told Ms. Herrera.

There were some conflicts in the testimony about the defendants' alleged consent to let the officers into the house. At one point in his testimony, Detective Mel-

on–Moran testified that he asked the defendants for permission to come in and speak to them. At another point he seemed to indicate that he merely stated to them he wanted to come in and speak to them. He testified that one of the defendants (he does not specifically remember which) "acknowledged" consent to enter. He testified by "acknowledging consent" he meant one of the defendants gave some affirmative verbal response, although he does not remember what exact words were spoken. At another point he testified that one of the defendants nodded their head and stepped back from the door. Detective Melon–Moran testified he does not remember whether he opened the screen door or whether the defendants did. He conceded he may have grabbed the screen door and opened it.[1]

The defendants' version of events was somewhat different. As indicated above, Ms. Herrera testified that Detective Melon–Moran impeded her from closing the door and then told her the officers wanted to come in and ask some questions. She testified that she was scared and let go of the door, backing away as the officers entered. She testified that she was frightened by the police showing up at that hour, and she simply thought that "they have the power" to come in the house. She testified that the officer did not ask for permission to enter. She said two of the officers entered and began asking if Treto lived at the house. Mr. Reyes, for his part, testified that he came out of the shower and was almost to the front door when the police came inside. He testified that he never gave permission for the po-

---

1. The court does not mean to suggest by these comments that the detective was not a credible witness. To the contrary, Detective Melon–Moran's testimony was generally credible, but his lack of memory as to certain particulars resulted in a somewhat vague or conflict-ing description of the officers' entry into the house. The lack of memory is understandable given the passage of time since this incident occurred, but as the court notes infra the government has the burden to demonstrate that a valid consent was given.

lice to enter and never heard his wife do so.

Mr. Reyes is 34 years old. He is approximately 5'3" tall. Both of the defendants testified that they speak only Spanish and no English. (No evidence was presented to the contrary.) Mr. Reyes attended some secondary school in Mexico, which he said was the equivalent of a ninth grade education in the U.S. He testified that he has been in the U.S. for five or six years. He said no one had ever told him about the constitutional rights of people in the United States. No evidence was presented concerning Ms. Herrera's educational background. Like Mr. Reyes, Ms. Herrera is diminutive in stature. The defendants have been married for approximately fifteen years. They have five children. Two of the children, ages 8 and 10, were in the house on the night of the search. Their other children were with Ms. Herrera's sister-in-law. Mr. Reyes testified that he and his wife rent the house at 822 S. Mission. He said the landlord used to be "a white guy," but now it is "an Asian guy named Jimmy."

The evidence at the suppression hearing about what happened after the officers entered the house was clearer to the court than the circumstances surrounding their initial entry. Detective Melon–Moran and Sgt. East entered the house and Melon–Moran began talking to Mr. Reyes. Mr. Reyes sat in a chair on the east wall of the house. Detective Melon–Moran stood in front of him and Sgt. East stood nearby. Two children were in the living room of the house playing video games. Ms. Herrera initially sat down, but then asked if she could go to the bedroom to put on some clothes. Detective Melon–Moran said that was fine. He then asked Mr. Reyes some questions, including whether he knew Jose Treto. Reyes admitted that he knew Treto. At some point, Melon–Moran asked Reyes if there were any narcotics in the house. Reyes pointed towards the bedroom. Melon–Moran called to Ms. Herrera, who was in the bedroom where she had gone to change clothes. When she returned to the living room, her husband told her to get the "hali" (a slang term for cocaine). Ms. Herrera went into the bedroom, retrieved a small "baggie" of cocaine from a jewelry box in the bedroom, and returned to the living room. Detective Melon–Moran asked if this was all they had and asked Mr. Reyes for permission to look. The evidence shows that Melon–Moran was polite to Reyes as he was asking questions, and the court concludes from the testimony presented that Reyes in fact indicated to Melon–Moran at that point that he could search the house. Melon–Moran informed Sgt. East that they had consent, and the officers searched the house. They summoned Officer Real from outside to assist. Sgt. East located an additional amount of cocaine in the bedroom. The officers also found three firearms in the bedroom. Mr. Reyes was arrested and was informed of his Miranda rights by Detective Melon–Moran. Mr. Reyes initially agreed to talk to the officers, but at some point he said he did not want to talk anymore.

The Wichita Police Department has written waiver forms for consent searches. Detective East testified he was not sure if those forms are printed in Spanish as well as English. The Department also has written Miranda rights waiver forms that are printed in both Spanish and English. The officers did not attempt to obtain written consent for the search of the defendants' residence or for the waiver of Miranda rights.

## II. Fourth Amendment Standards.

The Fourth Amendment provides in part that "the right of the people to be secure in their ... houses, ... against

unreasonable searches and seizures, shall not be violated. . . ." The physical entry of the house is the chief evil against which the Fourth Amendment is directed. See *Payton v. New York*, ·445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). A warrantless entry or search of a house is "per se unreasonable" unless a specifically defined exception—such as valid consent—is present. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

To be valid, consent must be freely and voluntarily given. *United States v. Patten*, 183 F.3d 1190, 1194 (10th Cir.1999). Voluntariness is a question of fact to be determined from the totality of the circumstances. Schneckloth, 412 U.S. at 227, 93 S.Ct. 2041. The government must prove by a preponderance of the evidence that consent was freely and voluntarily given. *United States v. Soto*, 988 F.2d 1548, 1557 (10th Cir.1993). To meet its burden, the government first must present clear and positive testimony that consent was unequivocal and freely and intelligently given. *United States v. Pena*, 143 F.3d 1363, 1367 (10th Cir.1998). The government also must prove that the officers used no implied or express duress or coercion in obtaining the consent. *Id.* The government does not discharge its burden "by showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 549, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

III. Discussion.

At the outset the court rejects the Government's assertion that the defendants lack standing to object to the search of the house. Although Mr. Reyes' testimony regarding his landlord was vague, it was sufficient, absent any contrary evidence, to show that the defendants were tenants to whom the premises had been leased and that they had a legitimate expectation of privacy in the house.

■  After considering the totality of the circumstances, the court concludes that the government has not met its burden of showing voluntary consent. As an initial matter, the court notes that the testimony of the government's witnesses was vague on certain key points, including whether Detective Melon–Moran initially asked for permission to enter, or whether he simply told the defendants he was conducting an investigation and wanted to come in and speak to them. The government's evidence also seemed to conflict as to how the defendants indicated their purported consent to the entry, whether verbally or by some other means. Against this backdrop, the circumstances under which the defendants allegedly gave their consent raises serious questions about whether the consent was voluntary. This "knock and talk" was conducted at almost one o'clock in the morning. It involved four armed officers. The officers had to knock repeatedly on the door to roust the residents of the house. These circumstances would likely be very intimidating to most people, and the evidence indicates that the defendants were in fact scared by the appearance of the officers under these circumstances. Approaching a house in the middle of the night in this manner could convey an impression that some type of emergency exists or perhaps that the police intend to raid the house. There was an inherent element of coercion in the situation, one that probably would not have been present in a daylight approach to a house by one or two officers. Additionally, the evidence suggested that the defendants have a limited educational background and a limited understanding of the rights of individuals in the United States to refuse a request by police to enter a house. They spoke only Spanish and could communicate with only one of the officers. No steps were taken to reduce the potentially coercive circumstances, such as by informing the defen-

dants that they had a right to refuse entry if they wished to do so. Nor did the officers employ a written waiver form, which the officers could have explained to the defendants, and which probably would have given the defendants a better understanding that they could refuse the officers' requests. In sum, the court concludes the Government has not shown that either of the defendants voluntarily consented to let the officers enter the house.[2] The Government does not argue that the entry was justified on any other basis, and the court therefore concludes that the entry into the house was unreasonable under the Fourth Amendment.

■■ Notwithstanding the unlawful entry, a question remains whether the search of the house was permissible in view of a subsequent consent by Mr. Reyes while he was in the house talking to Detective Melon–Moran. A search preceded by a Fourth Amendment violation may still be valid if a defendant's consent to that search "was voluntary in fact under the totality of the circumstances." *United States v. Fernandez,* 18 F.3d 874, 881 (10th Cir.1994). When there has been such a violation, the government bears the heavy burden of showing that the primary taint of that violation was purged. *Id.* To satisfy this burden, "the government must prove, from the totality of the circumstances, a sufficient attenuation or 'break in the causal connection between the illegal [action] and the consent.'" *United States v. Gregory,* 79 F.3d 973, 979 (10th Cir. 1996). No single fact is dispositive, but the so-called "Brown factors" (from *Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)) are especially important: (1) the temporal proximity of the illegal [action] and consent, (2) any

intervening circumstances, and (3) the purpose and flagrancy of any official misconduct. *United States v. Caro,* 248 F.3d 1240, 1247 (10th Cir.2001).

■ Under the facts of this case, the court cannot find there was a sufficient attenuation between the unlawful entry and Mr. Reyes' purported consent. The alleged consent came within a few minutes of the officers' entry. Cf. *United States v. Sandoval,* 29 F.3d 537, 543 (10th Cir.1994) (consent given 20 minutes after illegal detention did not support finding of voluntariness). There were no intervening circumstances present to "break the causal connection" or eliminate the coercive effects of the unlawful entry. As for the purpose and flagrancy of the misconduct, the officers' conduct here may have been well-intentioned, but as the court noted above, a warrantless entry into a house is presumptively unreasonable, and the physical entry of the house is the chief evil against which the Fourth Amendment is directed. The purported consent to search from Mr. Reyes was a direct product of the unlawful entry, and the court cannot find that the search was permissible under the Fourth Amendment. Cf. *United States v. Maez,* 872 F.2d 1444, 1453 (10th Cir.1989) ("If the consent is not sufficiently an act of free will to purge the primary taint of the illegal detention, . . . it must be suppressed as 'fruit of the poisonous tree.'"). See also *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (court must determine whether the evidence was obtained by exploitation of illegal means or instead by means that are "purged of the primary taint."). The motions to suppress the evi-

---

**2.** The Government points out in its response that the testimony of the defendants was vague or conflicting on various points. That is true, but as the court noted above, the

testimony of the Government's own witnesses failed to establish clearly that the defendants voluntarily consented to the entry into the house.

dence obtained in the residence will therefore be granted.

IV.   Conclusion.

Defendant Carolina Herrera–Ortega's Motion to Suppress (Doc. 24) and defendant Jose Reyes–Montes' Motion to Suppress (Doc. 25) are hereby GRANTED. IT IS SO ORDERED this Day of November, 2002, at Wichita, Ks.