# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

          Plaintiff-Appellee,

v

MICHAEL CHRISTOPHER FREDERICK,

          Defendant-Appellant.

FOR PUBLICATION
December 8, 2015

No. 323642
Kent Circuit Court
LC No. 14-003216-FH

---

PEOPLE OF THE STATE OF MICHIGAN,

          Plaintiff-Appellee,

v

TODD RANDOLPH VAN DOORNE,

          Defendant-Appellant.

No. 323643
Kent Circuit Court
LC No. 14-003215-FH

---

Before: TALBOT, C.J., and K. F. KELLY and SERVITTO, JJ.

Servitto, J. (*dissenting*).

      I respectfully dissent.

      On remand, our Supreme Court directed us to address "whether the 'knock and talk' procedure conducted in [these cases] is consistent with U.S. Const. Am. IV. as articulated in *Florida v Jardines*, __ US __, 133 S Ct 1409, 185 L Ed 2d 495 (2013)." The majority interprets this directive to mean that our inquiry is strictly limited to the question of whether the knock and talk procedures utilized in these cases amount to a "search" within the meaning of the Fourth Amendment, indicating its belief that the United States Supreme Court's inquiry in *Jardines* was firmly limited to the question of whether the officers' behavior was a search within the meaning of the Fourth Amendment. I disagree that our Supreme Court's directive was so restricted or narrow, or that the *Jardines* Court's inquiry was so limited.

-1-

In *Jardines*, the United States Supreme Court began by stating the basic principle that a search within the meaning of the Fourth Amendment occurs when the government obtains information by physically intruding on persons or houses. *Id*. at 1414. According to *Jardines*:

> That principle renders this case a straightforward one. The officers were gathering information in an area belonging to Jardines and immediately surrounding his house—in the curtilage of the house, which we have held enjoys protection as part of the home itself. And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner. [*Id*. at 1414]

The United States Supreme Court then went on, however, to engage in a lengthy analysis of whether Jardines had "given his leave" for the police and their dog to be on his front porch. Thus, the case focused on the scope of an implicit license and the objective reasonableness of what they deemed to be an obvious search—not, as the majority asserts, whether a search had occurred at all. This focus makes sense because the Fourth Amendment protects against unreasonable searches and seizures, not simply searches and seizures. The *Jardines* court stated,

> . . . the question before the court is precisely *whether* the officer's conduct was an objectively reasonable search. As we have described, that depends upon whether the officers had an implied license to enter the porch, which in turn depends upon the purpose for which they entered. *Id*. at 1416-1417 (emphasis in original).

According to the *Jardines* Court:

A license may be implied from the habits of the country, notwithstanding the strict rule of the English common law as to entry upon a close. We have accordingly recognized that the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers, and peddlers of all kinds. This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters. *Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen might do.* [*Id.* at 1415-1416 (internal citations and quotations omitted and emphasis added).]

The United States Supreme Court further stated that the scope of the license was limited to a particular area *and* to a specific purpose. *Id*. at 1416. Thus, though it cannot be denied that the final holding of *Jardines* was that a search occurred, the answer to that question required an expansive inquiry and analysis into several factors, including the context of the procedure employed and the reasonableness of the officers' actions.

A knock and talk represents one tactic employed by police officers that does not generally contravene the Fourth Amendment. See, e.g., *People v Frohriep*, 247 Mich App 692, 698; 637 NW2d 562 (2001) ("We conclude that in the context of knock and talk the mere fact that the officers initiated contact with a citizen does not implicate constitutional protections."). The *Frohriep* Court also recognized, however, that the knock and talk procedure is not entirely without constitutional implications. "Anytime the police initiate a procedure, whether by search warrant or otherwise, the particular circumstances are subject to judicial review to ensure compliance with general constitutional protections. Accordingly, what happens within the context of a knock and talk contact and any resulting search is certainly subject to judicial review." *Id*. at 698.

The majority opinion in *Jardines* did not expressly discuss any spatial or temporal limitations on the implied license to approach a home. The dissent, however, did. See *id.* at 1422-1423 (ALITO, J., dissenting). Specifically, the dissent found that the implied license contained the following limitations: (1) "A visitor must stick to the path that is typically used to approach a front door, such as a paved walkway"; (2) A visitor may not "come to the front door in the middle of the night without an express invitation"; and (3) "[A] visitor may not linger at the front door for an extended period." *Id.* Though the majority opinion did not specifically impose any temporal limits, it favorably referenced the dissent's "no-night-rule" in a footnote. See *id.* 1416 n 3. In that footnote, the majority indicated that a "typical person" would find the use of a drug-sniffing dog "a cause for great alarm," which, it stated, was "the kind of reaction the dissent quite rightly relie[d] upon to justify its no-night-visits rule." *Id.* The majority also stated that the dissent presented "good questions" regarding the scope of the implied license, which included a consideration of "the appearance of things," "what is typical for a visitor," "what might cause alarm to a resident of the premises," "what is expected of ordinary visitors," and "what would be expected from a reasonably respectful citizen." *Id.* at 1415 n 2 (internal citations and quotations omitted).

Recently, in *United States v Walker*, 799 F3d 1361 (CA 11, 2015), the 11th Circuit Court of Appeals, determined that the scope of a knock and talk is limited in two respects. First, citing *Jardines*, 133 S Ct at 1416-1417, the Court indicated that this exception to the warrant requirement "ceases where an officer's behavior 'objectively reveals a purpose to conduct a search.' " The second limitation is that the exception is limited to the front door or a minor departure therefrom. *Walker*, 799 F3d at 1363.

Based on *Jardines* and our Supreme Court's directive, I would interpret the instant case as presenting the specific question of whether a knock and talk procedure conducted at a private residence in the middle of the night (the "pre-dawn hours"), without evidence that the occupant of the residence extended an explicit or implicit invitation to strangers to visit during those hours, is an unconstitutional search in violation of the Fourth Amendment. Michigan courts have yet to address possible constitutional limitations on the knock and talk procedure. See *People v Gilliam*, 479 Mich 253, 276 n 13; 734 NW2d 585 (2007)("This Court has not yet discussed the constitutionality of, or limits to, traditional knock-and-talk encounters."). Other jurisdictions have, however, addressed the limitations of implied consent with respect to police officers' warrantless approach to homes.

In *Kelley v State*, 347 P3d 1012 (Alas Ct App 2015), two Alaska state troopers, acting on an anonymous tip, drove up a defendant's driveway to her residence, set back from the road a considerable distance in a rural area, shortly after midnight. The troopers remained in their car for several minutes and rolled down the windows, sniffing the air. *Id*. at 1013. Detecting an odor of marijuana in the air, the troopers left and obtained a warrant to search the defendant's home. Their subsequent search of the defendant's home revealed evidence of a marijuana grow operation. *Id*. The trial court denied the defendant's motion to suppress the evidence seized in the search, reasoning that the driveway to the defendant's house was impliedly open to public use because it provided public ingress to and egress from her property. *Id*. The Alaska Court of Appeals directed the parties to brief the recently decided case of *Jardines* with respect to the defendant's appeal of the trial court's denial of her motion to suppress. *Id*.

The *Kelley* Court recognized *Jardines'* holding that a police officer has an implicit license to approach a home without a warrant and knock on the door because it is no more than a private citizen might also do. *Id*. at 1014. It also pointed out, however, that in *Jardines* the United States Supreme Court recognized that the scope of the implicit license was limited to the manner of the visit, quoting the *Jardines'* statement that "[t]o find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to—well, call the police." *Kelley*, 347 P3d at 1014, quoting *Jardines*, 133 S Ct at 1416. The *Kelley* Court thus found that the *manner* of the visit, was of paramount importance in the *Jardines* decision and helped set the framework for determining the scope of an implied license for approaching a home without a warrant.

In *Kelley*, the court determined that the search that took place in the case before it was *more* intrusive than that in *Jardines* because it took place after midnight. *Kelley*, 347 P3d at 1014. In making this determination, *Kelley* referred to Justice Alito's dissent in *Jardines* wherein he indicated that a visitor could not come to a home in the middle of the night without express invitation and further stated that the *Jardines* majority "referred approvingly to the dissent's 'no-night-visits rule.' " *Kelley*, 347 P3d at 1014-15. Ultimately, the *Kelley* court found that the officers' conduct constituted an illegal search, that the warrant obtained was tainted by the illegal search and that any evidence obtained under the warrant must be suppressed. *Id*. at 107.

We recognize that the *Kelley* majority, in addressing the dissent's position, specifically stated that "the legal principles that govern a 'knock and talk' do not apply here because the State never asserted, and the record does not show, that the troopers approached Kelley's residence to engage in a 'knock and talk.' " *Id*. at 1016. However, *Kelley* also pointed out that the knock and talk cases relied upon by the dissent all considered the lateness of the hour as an important factor to consider in assessing "the overall coerciveness and lawfulness of a knock and talk." *Id*.

In *United States v Lundin*, 47 F Supp 3d 1003, 1007-1008 (ND Cal 2014), after interviewing a kidnapping victim at a hospital in the early morning hours, a police officer contacted dispatch and requested a "be on the lookout" (BOLO) for the kidnapper, Lundin. The officer also requested that Lundin be arrested on several charges. In response to the BOLO, several other officers drove to Lundin's home at approximately 4:00 a.m. and knocked on his

front door.  *Id.* at 1008.  The officers heard loud crashing from the backyard of the home and they ordered whoever was out in the backyard to come out, at which point Lundin exited the backyard and was taken into custody.  *Id.*  Officers then searched Lundin's home and backyard, finding two firearms.  *Id.* at 1009.

In determining the reasonableness of the search conducted at Lundin's home, the US District Court pronounced that "it is 'a firmly-rooted notion in Fourth Amendment jurisprudence' that a resident's expectation of privacy is not violated, at least in many circumstances, when an officer intrudes briefly on a front porch to knock on a door in a non-coercive manner to ask questions of a resident."  *Id.* at 1010.  As in *Jardines*, the *Lundin* court noted that rationale for the above is that residents of a home typically extend an implied license to strangers to approach the home by the front path, knock, and linger briefly to be received, or absent invitation to stay longer, to leave.  *Id.* at 1011.  The *Lundin* court stated that two factors, however, indicated that the officers' conduct in that case exceeded the scope of the recognized implied license:  (1) their purpose was to locate Lundin and to arrest him; (2) the approach took place at 4:00 a.m.  *Id.*

In contemplating the purpose of the officers' visit, the *Lundin* court indicated that whether the officer's conduct was an objectively reasonable search depends upon whether the officers had an implied license to enter the porch, "which in turn *depends upon the purpose for which they entered.*"  *Id.* at 1012 (emphasis in original).  The court did not hold that the officers' purpose was a dispositive factor in analyzing whether the officers' visit fell within the scope of a lawful knock and talk but that it was at least a significant factor.  *Id.* at 1013.  The time of the visit, 4:00 a.m., was the other significant factor, it being "a time at which most residents do not extend an implied license for strangers to visit."  *Id.*  The *Lundin* court concluded that, "[b]y entering onto Lundin's curtilage at four in the morning for the purpose of locating Lundin to arrest him, the officers engaged not in a lawful 'knock and talk' but rather in a presumptively unreasonable search."  *Id.* at 1014.

While not presented with a situation wherein an officer attempted to contact the homeowner[1], the Kentucky Supreme Court nonetheless found it necessary to address the time of day of an officer's visit to a home to determine the reasonableness of such a visit in *Com v Ousley*, 393 SW3d 15 (Ky 2013).  The *Com* court stated, "Surely there is no reasonable basis for consent to ordinary public access, presumed or otherwise, for the public to enter one's property at midnight absent business with the homeowner.  Girl Scouts, pollsters, mail carriers, door-to-door salesmen just do not knock on one's door at midnight . . . ."  *Id.* at 30.  The court also noted that the time limitation appears in several curtilage cases and that:

> One of the earliest knock-and-talk cases laid out the rule as follows:
>
> Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a

---

[1] An officer removed trash from the curtilage of a home in the late night/early morning hours in order to investigate tips that the homeowner was engaged in illegal drug sales from the home.

-5-

condemned invasion of the person's right of privacy, for anyone openly and peaceably, *at high noon,* to walk up the steps and knock on the front door of any man's 'castle' with the honest intent of asking questions of the occupant thereof— whether the questioner be a pollster, a salesman, or an officer of the law.

*Davis v United States*, 327 F2d 301, 303 (9th Cir 1964), *impliedly overruled on other grounds as suggested in United States v Perea–Rey,* 680 F3d 1179, 1187 (9th Cir 2012) (emphasis added).

As *Davis* went on to note, "The time of day, coupled with the openness of the officers' approach to defendant's doorway, rules out the possible dangers to their persons which might have resulted from a similar unannounced call in the dead of night." *Id.* at 304. Numerous other cases mention time of the invasion as a factor in whether the Fourth Amendment is violated. [Id. at 30-31]

*Com* thus concluded that, "just as the police may invade the curtilage without a warrant only to the extent that the public may do so, they may also invade the curtilage only *when* the public may do so." *Id*. at 31 (emphasis in original).

In a pre-*Jardines* case, *State v Cada*, 129 Idaho 224; 923 P2d 469 (1996), considering observations made by police from a defendant's driveway during 1:00 a.m. and 4:00 a.m. visits, the court indicated that the time of day and openness of the officer's approach have been found to be significant factors in determining whether the scope of the implied invitation to enter areas of a private home's curtilage were exceeded. "Furtive intrusion late at night or in the predawn hours is not conduct that is expected from ordinary visitors." *Id*. at 233.

In sum, the time of a knock and talk visit, while not perhaps the *singular* deciding factor in determining whether an unconstitutional (unreasonable) search occurred is at least a *significant* factor among those to be considered among the totality of the circumstances surrounding the knock and talk. In these consolidated cases, the totality of the circumstances leads me to conclude that both knock and talk occurrences constituted unconstitutional searches.

On the night of March 17, 2014, seven officers appeared for the knock and talks at defendants' (corrections officers with Kent County) homes. The officers arrived at each house in four unmarked vehicles and each wearing a tactical vest with a firearm on his or her hip (though not in full uniform). The officers went to Frederick's home at approximately 4:14 a.m. and then went to Van Doorne's home at approximately 5:30 a.m. Each defendant was asleep when the officers arrived and the officers pounded on a door to each home before making contact with each defendant. Officers pounded on Frederick's front door, but were unable to approach Van Doorne's front door due to icy conditions and had to knock on a door next to the garage.

Under the circumstances of these cases, it is very difficult to imagine why the officers would have been seeking to initiate consensual conversations with Frederick and Van Doorne between 4:00 and 5:30 a.m. to simply ask each of them questions. Just as the behavior of the officers in *Jardines* "objectively reveals a purpose to conduct a search," 133 S Ct at 1417, the behavior of the officers here objectively reveals a purpose to conduct a search of these defendants' homes to obtain evidence without the necessity of a warrant.

Significantly, at least two of the officers testified that they had enough probable cause to obtain search warrants for the homes but did not do so, instead electing to go to defendants' homes in the early morning hours as a matter of "courtesy" because defendants were officers employed by the same sheriff's department. Van Doorne testified that one of the officers told him that the choice was made to not seek a warrant because the department did not want a public record of the situation at that point. The highest-ranking officer on the scene admitted that at some point, he told Van Doorne that the decision was made not to get a warrant because if a warrant was obtained, the media would get ahold of it right away. From the testimony, then, it can be concluded that the primary purpose of conducting the knock and talks was to obtain the evidence that one officer had told the involved officers that he had delivered to defendants a short time prior, without obtaining a warrant, so as to avoid publicity on the Kent County Sheriff's Department. Objectively, according to the testimony, the officers that appeared at defendant's homes in the early morning hours did not seek to ask defendants questions but sought to search defendants' homes to obtain perishable evidence before it "disappeared" and to avoid publicity for their department.

The time of day that the officers appeared at defendants' homes also lends support for finding that their conduct violated the Fourth Amendment. As previously indicated, the knock and talk exception to the warrant requirement is premised, on its most basic level, on the fact that the police are acting consistent with the implied license that a homeowner extends to the public at large. *Jardines*, 133 S Ct at 1415. There is no evidence that either Frederick or Van Doorne extended an invitation to the public to come to their homes between the hours of 4:00 a.m. and 5:30 a.m. Absent evidence that Frederick and/or Van Doorne regularly expected or accepted visitors or public company at those hours, the officers cannot rely upon on the implied consent exception for their knock and talks conducted at 4:00 a.m. and 5:30 a.m., those not being times at which most residents extend implied licenses for strangers to visit. *Lundin*, 47 F Supp 3d at 1013. Moreover, several of the involved officers, including the lead officer, testified that they could have waited and spoken to defendants several hours later, during daylight hours.

Yet another factor worthy of consideration is the sheer number of officers who appeared at defendants' homes in the early morning hours. By all accounts, seven officers came to defendants' homes, wearing their tactical gear and were armed in order to, according to officers, conduct knock and talks. It is difficult to conceive of a reason why it would be necessary for seven officers to come to the home of another officer at 4:00 a.m. or 5:30 a.m. for the stated purpose of simply asking questions.

I reach my conclusion that the officers' conduct violated the Fourth Amendment based on *all* of the circumstances of this case—including the time of night, an objective view of the officers' conduct, and the officers' failure to advance any objectively reasonable motivation why they could not gather their evidence during the day, or proceed with obtaining a warrant. As a result, I would reverse the trial court's order in each case and remand to the trial court for entry of an order granting defendants' motions to suppress the evidence. I would reach this conclusion despite the fact that defendants consented to the officers' conducting searches of their homes after speaking to defendants.

A search preceded by a Fourth Amendment violation may still be valid if a defendant's consent to that search "was voluntary in fact under the totality of the circumstances." *United States v Fernandez,* 18 F3d 874, 881 (10th Cir 1994).

> When there has been such a violation, the government bears the heavy burden of showing that the primary taint of that violation was purged. To satisfy this burden, the government must prove, from the totality of the circumstances, a sufficient attenuation or break in the causal connection between the illegal [action] and the consent. No single fact is dispositive, but the so-called "Brown factors" (from *Brown v Illinois,* 422 US 590, 603-04; 95 S Ct 2254; 45 L Ed 2d 416 (1975)) are especially important: (1) the temporal proximity of the illegal [action] and consent, (2) any intervening circumstances, and (3) the purpose and flagrancy of any official misconduct. *United States v Reyes-Montes*, 233 F Supp 2d 1326, 1331 (D Kan 2002)(internal citations and quotations omitted).

In these consolidated cases, I cannot find there was a sufficient attenuation between the unlawful entries and the defendants' consents. The consent of each defendant came within a few minutes of the officers' entries. There were no intervening circumstances present to "break the causal connection" or eliminate the coercive effects of the unlawful entry. As for the purpose and flagrancy of the misconduct, as in *Reyes-Montes*, 233 F Supp 2d at 1331 "the officers' conduct here may have been well-intentioned, but as the court noted above, a warrantless entry into a house is presumptively unreasonable, and the physical entry of the house is the chief evil against which the Fourth Amendment is directed." The purported consent to search obtained from defendants directly flowed from the officers' unlawful entry, and I thus cannot find that the searches were permissible under the Fourth Amendment.

Even if the knock and talks were viewed as permissible, a knock and talk becomes a seizure requiring reasonable suspicion where a law enforcement officer, through coercion, physical force, or a show of authority, in some way restricts the liberty of a person. *United States v Chan-Jiminez*, 125 F3d 1324 (CA 9 1997); see also, *United States v Crapser*, 472 F3d 1141, 1150 (CA 9 2007) *Reinhardt, dissenting*. "[F]actors, such as a display of weapons, physical intimidation or threats by the police, multiple police officers questioning the individual, or an unusual place or time for questioning may transform a consensual encounter between a citizen and a police officer into a seizure." *United States v Ponce Munoz,* 150 F Supp 2d 1125, 1133 (D Kan 2001).

Again, in these cases, the circumstances are that seven officers appeared in the very early morning hours of the fellow officers' homes, purportedly to ask them questions. The officers who approached the door, at least two of whom were higher in rank than defendants, knocked for several minutes, aware that no one in the homes was awake. While neither Frederick nor Van Doorne felt "threatened" per se by the officers, both were in the unique situation where their employment was with the same department as the officers at their homes. Understandably, Frederick and Van Doorne testified that because members of their own department were at their door and asked to come to talk to them about an investigation, they felt they were not free to say no, as they would be risking their employment if they failed to comply with a department request. Seven officers appearing at the home of a fellow officer, in tactical gear, armed, in the wee hours of the morning, advising that the officer's name had come up in a criminal

investigation could be viewed as a show of authority in order to assure that their "request" to come inside and speak to the officer and/or for permission to search the officer's home would not be denied.  The ordinary remedy in a criminal case for violation of the Fourth Amendment is the suppression of any evidence obtained during the illegal police conduct (*United States v Perez-Partida*, 773 F Supp 2d 1054, 1059 (DNM 2011)), and I would find it to be the appropriate remedy here.

/s/ Deborah A. Servitto