SERVITTO, J.
(dissenting).
I respectfully dissent.
On remand, our Supreme Court directed us to address “whether the ‘knock and talk’ procedure conducted in [these cases] is consistent with US Const, Am IV, as articulated in Florida v Jardines, [569 US_;] 133 S Ct 1409[; 185 L Ed 2d 495] (2013).” People v Frederick, 497 Mich 993 (2015). People v Van Doorne, 497 Mich 993 (2015). The majority interprets this directive to mean that our inquiry is strictly limited to the question whether the knock-and-talk procedure used in these cases amounts to a “search” within the meaning of the Fourth Amendment, indicating its belief that the United States Supreme Court’s inquiry in Jardines was firmly limited to the question whether the officers’ behavior was a search within the meaning of the Fourth Amendment. I disagree that our Supreme Court’s directive was so restrictive or narrow, or that the Jardines Court’s inquiry was so limited.
In Jardines, the United States Supreme Court began by stating the basic principle that a search within the meaning of the Fourth Amendment occurs when the government obtains information by physically intruding on persons or houses. Jardines, 569 US at_; 133 S Ct at 1414. According to Jardines:
*486 That principle renders this case a straightforward one. The officers were gathering information in an area belonging to Jardines and immediately surrounding his house—in the curtilage of the house, which we have held enjoys protection as part of the home itself. And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner. [Id. at_; 133 S Ct at 1414.]
The United States Supreme Court then went on, however, to engage in a lengthy analysis of whether Jardines had “given his leave” for the police and the dog to be on his front porch. Thus, the case focused on the scope of an implicit license and the objective reasonableness of what the Court deemed to be an obvious search, and not, as the majority asserts, whether a search had occurred at all. This focus makes sense because the Fourth Amendment protects against unreasonable searches and seizures, not simply searches and seizures. The Jardines Court stated that
the question before the court is precisely whether the officer’s conduct was an objectively reasonable search. As we have described, that depends upon whether the officers had an implied license to enter the porch, which in turn depends upon the purpose for which they entered. [Id. at _; 133 S Ct at 1416-1417.]
According to the Jardines Court:
A license may be implied from the habits of the country, notwithstanding the strict rule of the English common law as to entry upon a close. We have accordingly recognized that the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds. This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. Complying with the terms of that traditional invitation does not require fine-grained legal *487 knowledge; it is generally managed without incident by the Nation’s Girl Scouts and trick-or-treaters. Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen might do. [Id._; 133 S Ct at 1415-1416 (quotation marks and citations omitted; emphasis added).]
The United States Supreme Court further stated that the scope of the license was limited to a particular area and to a specific purpose. Id._; 133 S Ct at 1416. Thus, though it cannot be denied that the final holding of Jardines was that a search occurred, the answer to that question required an expansive inquiry into, and analysis of, several factors, including the context of the procedure employed and the reasonableness of the officers’ actions.
A knock-and-talk represents one tactic employed by police officers that does not generally contravene the Fourth Amendment. See, e.g., People v Frohriep, 247 Mich App 692, 698; 637 NW2d 562 (2001) (“We conclude that in the context of knock and talk the mere fact that the officers initiated contact with a citizen does not implicate constitutional protections.”). The Frohriep Court also recognized, however, that the knock-and-talk procedure is not entirely without constitutional implications. “Anytime the police initiate a procedure, whether by search warrant or otherwise, the particular circumstances are subject to judicial review to ensure compliance with general constitutional protections. Accordingly, what happens within the context of a knock and talk contact and any resulting search is certainly subject to judicial review.” Id. at 698.
The majority opinion in Jardines did not expressly discuss any spatial or temporal limitations on the implied license to approach a home. The dissent, however, did. See Jardines, 569 US at_; 133 S Ct at 1422-1423 *488 (Alito, J., dissenting). Specifically, the dissent found that the implied license contained the following limitations: (1) “[a] visitor must stick to the path that is typically used to approach a front door, such as a paved walkway”; (2) a visitor may not “come to the front door in the middle of the night without an express invitation”; and (3) “a visitor may not linger at the front door for an extended period.” Id. at_; 133 S Ct at 1422. Though the majority opinion did not specifically impose any temporal limits, it favorably referred to the dissent’s “no-night-visits rule” in a footnote. See id. at_n 3; 133 S Ct at 1416 n 3 (opinion of the Court). In that footnote, the majority indicated that a “typical person” would find the use of a drug-sniffing dog “a cause for great alarm,” which, it stated, was “the kind of reaction the dissent quite rightly relie [d] upon to justify its no-night-visits rule[.]” Id. at_n 3; 133 S Ct at 1416 n 3. The majority also stated that the dissent presented “good questions” regarding the scope of the implied license, which included a consideration of “the appearance of things,” “what is typical for a visitor,” “what might cause alarm to a resident of the premises,” “what is expected of ordinary visitors,” and “what would be expected from a reasonably respectful citizen[.]” Id. at _n 2; 133 S Ct at 1415 n 2 (quotation marks omitted).
Recently, in United States v Walker, 799 F3d 1361 (CA 11, 2015), the United States Court of Appeals for the Eleventh Circuit determined that the scope of a knock-and-talk is limited in two respects. First, citing Jardines, 569 US at_; 133 S Ct at 1416-1417, the court indicated that this exception to the warrant requirement “ceases where an officer’s behavior ‘objectively reveals a purpose to conduct a search.’ ” The second limitation is that “the exception is geographically limited to the front door or a ‘minor departure’ from it.” Walker, 799 F3d at 1363.
*489 Based on Jardines and our Supreme Court’s directive, I would interpret the instant case as presenting the specific question of whether a knock-and-talk procedure conducted at a private residence in the middle of the night (the “predawn hours”), without evidence that the occupant of the residence extended an explicit or implicit invitation to strangers to visit during those hours, is an unconstitutional search in violation of the Fourth Amendment. Michigan courts have yet to address possible constitutional limitations on the knock- and-talk procedure. See People v Gillam, 479 Mich 253, 276 n 13; 734 NW2d 585 (2007) (KELLY, J., dissenting) (“This Court has not yet discussed the constitutionality of, or limits to, traditional knock-and-talk encounters.”). Other jurisdictions have, however, addressed the limitations of an implicit license with respect to police officers’ warrantless approach to homes.
In Kelley v State, 347 P3d 1012, 1013 (Alas App, 2015), two Alaska state troopers, acting on an anonymous tip, drove up a defendant’s driveway shortly after midnight. The defendant’s home was in a rural area and set back from the road a considerable distance. Id. The troopers remained in their car for several minutes and rolled down the windows, sniffing the air. Id. Detecting an odor of marijuana in the air, the troopers left and obtained a warrant to search the defendant’s home, which revealed evidence of a marijuana grow operation. Id. The trial court denied the defendant’s motion to suppress the evidence seized in the search, reasoning “that the driveway to [the defendant]’s house was impliedly open to public use because it provided public ingress to and egress from her property . . . .” Id. The Alaska Court of Appeals directed the parties to brief the recently decided case of Jardines with respect to the defendant’s appeal of her conviction. Id.
*490 The Kelley court recognized Jardines’s holding “that a police officer has an implicit license to approach a home without a warrant and knock on the front door because this is ‘no more than any private citizen might do.’ ” Id. at 1014. It also pointed out, however, that in Jardines, the United States Supreme Court recognized that the scope of the “implicit license [wa]s limited not only to the normal paths of ingress and egress, but also by the manner of the visit.” Id. The Kelley court quoted Jardines’s statement that “ ‘[t]o find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to—well, call the police.’ ” Id., quoting Jardines, 569 US at_; 133 S Ct at 1416. The Kelley Court thus found that the manner of the visit was of paramount importance in the Jardines decision.
In Kelley, the court determined that the search there was more intrusive than was the search in Jardines because it took place after midnight. Kelley, 347 P3d at 1014. In making this determination, Kelley referred to Justice Alito’s dissent in Jardines in which he indicated that a visitor could not come to a home in the middle of the night without express invitation. Id. The Kelley court further stated that the Jardines majority “referred approvingly to the dissent’s ‘no-night-visits rule.’ ” Id. at 1014-1015. Ultimately, the Kelley court found that the officers’ conduct constituted an illegal search, that the warrant obtained was tainted by the illegal search, and that any evidence obtained under the warrant must be suppressed. Id. at 1016.
We recognize that the Kelley majority, in addressing the dissent’s position, specifically stated that “the legal principles that govern a ‘knock and talk’ do not apply *491 here, because the State never asserted, and the record does not show, that the troopers approached Kelley’s residence to engage in a knock and talk.” Id. However, Kelley also pointed out that all the knock-and-talk cases relied on by the dissent considered the lateness of the hour as an important factor to consider “in assessing the overall coerciveness and lawfulness of a knock and talk.” Id.
In United States v Lundin, 47 F Supp 3d 1003, 1007-1008 (ND Cal. 2014), after interviewing a kidnapping victim at a hospital in the early morning hours, a police officer contacted dispatch and requested a BOLO (“be on the lookout”) for the kidnapper, Lundin. The officer also requested that Lundin be arrested on several charges. Id. at 1008. In response to the BOLO, another officer drove to Lundin’s home, saw Lundin’s car and light on inside the home, and called for backup. Id. At approximately 4:00 a.m. the officers knocked on Lundin’s front door. Id. The officers heard loud crashing from the back of the home, and they ordered whoever was in the backyard to come out with hands up, at which point Lundin exited the backyard and was taken into custody. Id. Officers then searched Lundin’s home and backyard, finding two firearms. Id. at 1009.
In determining the reasonableness of the search conducted at Lundin’s home, the United States District Court for the Northern District of California pronounced that “it is ‘a firmly-rooted notion in Fourth Amendment jurisprudence’ that a resident’s expectation of privacy is not violated, at least in many circumstances, when an officer intrudes briefly on a front porch to knock on a door in a non-coercive manner to ask questions of a resident.” Id. at 1011. As in Jar-dines, the Lundin court noted that the rationale for this is that residents of a home typically extend an *492 implicit license to strangers to approach the home by the front path, to knock, to linger briefly to be received, and absent invitation to stay longer, to leave. Id. at 1011. In Lundin, two factors indicated that the officers’ conduct exceeded the scope of the recognized implied license: (1) their purpose was to locate Lundin and to arrest him, not to talk to him, and (2) the approach took place at 4:00 a.m. Id.
In contemplating the purpose of the officers’ visit, the Lundin court indicated that whether the officers’ conduct constituted an objectively reasonable search depended on whether the officers had an implied license to approach Lundin’s home, which depended, in part, on their purpose for doing so. Id. at 1012. The court did not hold that the officers’ purpose was a dispositive factor in analyzing whether the officers’ visit fell within the scope of a lawful knock-and-talk, but that it was at least a significant factor. Id. at 1013. The time of the visit, 4:00 a.m., was the other significant factor, it being “a time at which most residents do not extend an implied license for strangers to visit.” Id. The Lundin court concluded that “[b]y entering onto Lundin’s curtilage at four in the morning for the purpose of locating him to arrest him, the officers engaged not in a lawful ‘knock and talk’ but rather in a presumptively unreasonable search.” Id. at 1014.
While not presented with a situation in which an officer attempted to contact the homeowner,[1] the Kentucky Supreme Court, to determine the reasonableness of such a visit, nonetheless found it necessary to address the time of day an officer visited a home. Commonweath v Ousley, 393 SW3d 15 (Ky, 2013). The *493 Ousley court stated, “Surely there is no reasonable basis for consent to ordinary public access, presumed or otherwise, for the public to enter one’s property at midnight absent business with the homeowner. Girl Scouts, pollsters, mail carriers, door-to-door salesmen just do not knock on one’s door at midnight. . . Id. at 30. The court also noted that the time limitation appears in several curtilage cases and that
[o]ne of the earliest knock-and-talk cases laid out the rule like this:
Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person’s right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man’s “castle” with the honest intent of asking questions of the occupant thereof—whether the questioner be a pollster, a salesman, or an officer of the law. Davis v. United States, 327 F.2d 301, 303 (9th Cir.1964), impliedly overruled on other grounds as suggested in United States v. Perea-Rey, 680 F.3d 1179, 1187 (9th Cir.2012) (emphasis added).
As Davis went on to note, “The time of day, coupled with the openness of the officers’ approach to defendant’s doorway, rules out the possible dangers to their persons which might have resulted from a similar unannounced call in the dead of night.” Id. at 304. Numerous other cases mention time of the invasion as a factor in whether the Fourth Amendment is violated. [Ousley, 393 SW3d at 30-31.]
Ousley thus concluded that, “just as the police may invade the curtilage without a warrant only to the extent that the public may do so, they may also invade the curtilage only when the public may do so.” Id. at 31.
*494 In a pre-Jardines case involving observations made by the police from a defendant’s driveway during 1:00 a.m. and 4:00 a.m. visits, an Idaho appellate court indicated that the time of day and openness of the officer’s approach have been found to be significant factors in determining whether the scope of the implied invitation to enter areas of a private home’s curtilage was exceeded. State v Cada, 129 Idaho 224; 923 P2d 469 (1996). “Furtive intrusion late at night or in the predawn hours is not conduct that is expected from ordinary visitors.” Id. at 233.
In sum, the time of a knock-and-talk visit, while perhaps not the only deciding factor in determining whether an unconstitutional (unreasonable) search occurred, is at least a significant factor among those to be considered along with the totality of the circumstances surrounding the knock-and-talk. In these consolidated cases, the totality of the circumstances leads me to conclude that both knock-and-talk occurrences constituted unconstitutional searches.
On the night of March 17, 2014, seven officers appeared for the knock-and-talks at defendants’ (corrections officers with Kent County) homes. The officers arrived at each house in four unmarked vehicles. Each officer wore a tactical vest with a firearm on his or her hip, but the officers were not in full uniform. The officers went to Frederick’s home at approximately 4:14 a.m., and then went to Van Doorne’s home at approximately 5:30 a.m. Each defendant was asleep when the officers arrived, and the officers pounded on a door to each home before making contact with each defendant. The officers pounded on Frederick’s front door, but had to knock on a door next to the garage at Van Doorne’s because icy conditions prevented the officers from approaching Van Doorne’s front door.
*495 Considering the circumstances of these cases, it is very difficult to imagine why the officers tried to initiate consensual conversations with Frederick and Van Doorne between 4:00 a.m. and 5:30 a.m. to simply ask questions of each of them. Just as the behavior of the officers in Jardines “objectively reveals a purpose to conduct a search,” Jardines, 569 US at_; 133 S Ct at 1417, the behavior of the officers in this case objectively reveals a purpose to conduct a warrantless search of these defendants’ homes to obtain evidence.
Significantly, at least two of the officers testified that they had enough probable cause to obtain search warrants for the homes but did not do so, instead electing to go to defendants’ homes in the early morning hours as a matter of “courtesy” because defendants were officers employed by the same sheriff department. Van Doorne testified that one of the officers told him that they chose to not seek a warrant because the department did not want a public record of the situation at that time. The highest-ranking officer on the scene admitted that at some point, he told Van Doorne that the decision was made to not get a warrant because if a warrant was obtained, the media would get hold of it right away. The testimony supports the conclusion that the primary purpose of conducting the knock-and-talks was to obtain—without a warrant— the evidence that one officer had earlier delivered to defendants. The officers claimed they did not get a warrant because they wished to avoid publicity focused on the Kent County Sheriff’s Department. Objectively, according to the testimony, the officers that appeared at defendants’ homes in the early morning hours did not seek to ask defendants questions, but rather, they sought to search defendants’ homes to obtain perishable evidence before it “disappeared,” and to avoid publicity.
*496 The time of day that the officers appeared at defendants’ homes also lends support for finding that their conduct violated the Fourth Amendment. As previously indicated, the knock-and-talk exception to the warrant requirement is premised, at its most basic level, on the fact that the police are acting consistently with the implied license a homeowner extends to the public-at-large. Jardines, 569 US at_; 133 S Ct at 1415. There is no evidence that either Frederick or Van Doorne extended an invitation to the public to come to their homes between the hours of 4:00 a.m. and 5:30 a.m. Absent evidence that Frederick or Van Doorne regularly expected or accepted visitors or public company at those hours, the officers cannot rely on the implied consent exception for the knock-and-talks they conducted at 4:00 a.m. and 5:30 a.m., because those are not times “at which most residents extend an implied license for strangers to visit.” Lundin, 47 F Supp 3d at 1013. Moreover, several of the involved officers, including the lead officer, testified that they could have waited and spoken to defendants several hours later, during daylight hours.
Yet another factor worthy of consideration is the sheer number of officers who appeared at defendants’ homes in the early morning hours. By all accounts, seven officers came to defendants’ homes, armed and wearing their tactical gear, to, according to the officers, conduct knock-and-talks. It is difficult to conceive of a reason why it would be necessary for seven officers to come to the home of another officer at 4:00 a.m. or 5:30 a.m. to simply ask questions.
I reach my conclusion that the officers’ conduct violated the Fourth Amendment on the basis of all of the circumstances of this case, including the time of night, an objective view of the officers’ conduct, and the *497 officers’ failure to advance any objectively reasonable explanation for why they could not gather their evidence during the day, or proceed with obtaining a warrant. As a result, I would reverse the trial court’s order in each case and remand to the trial court for entry of an order granting defendants’ motions to suppress the evidence. I reach this conclusion despite the fact that after the officers spoke to defendants, defendants consented to searches of their homes.
“A search preceded by a Fourth Amendment violation remains valid if the consent to search was voluntary in fact under the totality of the circumstances.” United States v Fernandez, 18 F3d 874, 881 (CA 10, 1994).
When there has been such a violation, the government bears the heavy burden of showing that the primary taint of that violation was purged. To satisfy this burden, the government must prove, from the totality of the circumstances, a sufficient attenuation or break in the causal connection between the illegal [action] and the consent. No single fact is dispositive, but the so-called “Brown factors” (from Brown v. Illinois, 422 U.S. 590, 603-04, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975)) are especially important: (1) the temporal proximity of the illegal [action] and consent, (2) any intervening circumstances, and (3) the purpose and flagrancy of any official misconduct. [United States v Reyes-Montes, 233 F Supp 2d 1326, 1331 (D Kan. 2002) (quotation marks and citations omitted; alterations in original).]
In these consolidated cases, as in Reyes-Montes, 233 F Supp 2d at 1331,1 cannot conclude that there was a sufficient attenuation between the unlawful entries and the defendants’ consents. The consent of each defendant came within a few minutes of the officers’ entries. Id. There were no intervening circumstances present to “break the causal connection” or eliminate *498 the coercive effects of the unlawful entry. Id. With regard to the purpose and flagrancy of the misconduct, “the officers’ conduct here may have been well-intentioned, but... a warrantless entry into a house is presumptively unreasonable, and the physical entry of the house is the chief evil against which the Fourth Amendment is directed.” Id. The defendants’ purported consent to search directly flowed from the officers’ unlawful entry, and thus I cannot find that the searches were permissible under the Fourth Amendment.
Even if the knock-and-talks were viewed as permissible, “[a] knock and talk becomes a seizure requiring reasonable suspicion where a law enforcement officer, ‘through coercion, “physical force [,] or a show of authority, in some way restricts the liberty of a person.” ’ ” United States v Crapser, 472 F3d 1141, 1150 (CA 9, 2007) (Reinhardt, J., dissenting) (citation and emphasis omitted; alteration in original); see United States v Chan-Jiminez, 125 F3d 1324, 1326 (CA 9, 1997). “[F] actors, such as a display of weapons, physical intimidation or threats by the police, multiple police officers questioning the individual, or an unusual place or time for questioning may transform a consensual encounter between a citizen and a police officer into a seizure.” United States v Ponce Munoz, 150 F Supp 2d 1125, 1133 (D Kan. 2001).
Again, in these cases, seven officers appeared in the very early morning hours at the fellow officers’ homes, purportedly to ask them questions. The officers who approached the door, at least two of whom were higher in rank than defendants, knocked for several minutes, aware that no one was awake in the homes. While neither Frederick nor Van Doorne felt “threatened” by the officers, both were in a unique situation—both defendants were employed by the same department as *499 the officers at their homes. Understandably, Frederick and Van Doorne testified that because members of their own department were at their doors asking to talk to them about an investigation, they felt that they were not free to say no, and that they would be risking their employment if they failed to comply with a departmental request. Seven officers appearing at the home of a fellow officer in the wee hours of the morning, armed and in tactical gear, advising each defendant that his name had come up in a criminal investigation, could be viewed as a show of authority designed to assure that the defendants would not deny their “request” to enter each defendant’s home to talk, and/or for permission to search the defendants’ homes. “The ordinary remedy in a criminal case for violation of the Fourth Amendment is the suppression of any evidence obtained during the illegal police conduct,” United States v Perez-Partida, 773 F Supp 2d 1054, 1059 (D NM, 2011), and I would find it to be the appropriate remedy in these cases.

 An officer removed trash from the curtilage of a home in the late night/early morning hours in order to investigate tips that the homeowner was engaged in illegal drug sales from the home.